**FILED**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OKLAHOMA

OCT 1 5 2013

Phil Lombardi, Clerk
**U.S. DISTRICT COURT**

| | |
|---|---|
| (1) BURLINGTON RESOURCES OIL & GAS COMPANY LP, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. _____ |
| (1) UNITED STATES DEPARTMENT OF THE INTERIOR, | ) ) **13 CV - 6 7 8 CVE - TLW** |
| Defendant. | ) ) ) |

## COMPLAINT

As the basis for its claims against the United States Department of the Interior ("DOI"), Burlington Resources Oil & Gas Company LP ("BROG") alleges as follows:

### Jurisdiction & Venue

1.      This action concerns an alleged failure by BROG to pay royalties owed pursuant to federal lease obligations.  More specifically, this action follows the entry by the former Minerals Management Service ("MMS") of two orders dated February 28, 2008 and February 29, 2008, and subsequently styled as matters MMS-08-0054-O&G and MMS-08-0055-O&G within the agency.[1]  The orders address time periods from 1990-96 and 2000-02.

2.      BROG timely filed a Notice of Appeal and Initial Statement of Reasons with respect to each of those matters within MMS.  Following the execution of Extension Agreements that tolled the statutory 33-month deadline imposed by 30 U.S.C. § 1724(h), the Office of Natural Resources Revenue ("ONRR"), as the successor to MMS, transmitted Orders in October and November 2011 that granted in part and denied in part BROG's agency appeals.

---

[1] BROG was erroneously identified within those agency orders as Burlington Resources, Inc.

{1174064;}                                    [1]

3.    BROG timely commenced additional appeals of those dispositions and provided Statements of Reasons to the Interior Board of Land Appeals ("IBLA") in December 2011 and January 2012.  The IBLA then redesignated those disputes as IBLA 2012-96 and IBLA 2012-0159.  On May 17, 2012, the IBLA consolidated the cases under the docket number IBLA 2012-96.

4.    Following the execution of additional Extension Agreements, the IBLA issued a consolidated decision on April 23, 2013, and faxed its Order to counsel for BROG on that date. The IBLA's decision affirmed ONRR's prior orders in full.

5.    Accordingly, this action for judicial review of the IBLA's final agency disposition is filed pursuant to the specific authorization of 30 U.S.C. § 1724(j), which permits the commencement of such an action "within 180 days from receipt of notice by the lessee or its designee of the final agency action."  The filing of this action is also supported more generally by the judicial review provision of the Administrative Procedures Act, 5 U.S.C. § 704. Regardless, subject matter jurisdiction is supplied by 28 U.S.C. § 1331(a).

6.    DOI is a proper Defendant in this action pursuant to 5 U.S.C. § 703.  This district is a proper venue for this action pursuant to 28 U.S.C. § 1391(b), as a DOI/ONRR office is located at 1603 South 101st East Avenue, Suite 129, Tulsa, OK 74128-4629.

### Factual Background

Introduction

7.    BROG is a federal lessee and operator of multiple wells drilled upon federal leases in North Dakota.  Those wells produce conventional gas having sufficient Btu content (or "heating value") to be processed for the extraction of the natural gas liquids ("NGLs") in order to enhance the value of the gas production.

8.      Materially, BROG sold unprocessed gas at the wellhead pursuant to arm's-length percentage of proceeds ("POP") contracts to Bear Paw Energy, Inc. (now ONEOK Rockies Midstream, L.L.C. ("ORM")), a "midstream" purchaser, gatherer and processor of natural gas. ORM, in turn, processed the gas at its Grasslands Plant to yield residue gas and NGLs, and paid BROG for the wellhead sale on the basis of the contractual POP percentages related to resulting residue gas and NGLs.

The Applicable Legal and Regulatory Framework

9.      The applicable definition of "marketable condition" for federal gas, codified at 30 CFR § 206.151,[2] specifies that "marketable condition" means "lease products which are sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field or area." At the time that language was adopted as part of the 1988 regulations, MMS explained its intended application of the marketable condition rule as follows:

> The MMS believes that the definition is clear, concise, and equitable. The definition is not subject to manipulation, as one commenter stated. Furthermore, the suggestion that a uniform standard be developed for what is 'marketable' is unrealistic because the gas marketplace is dynamic. The definition, as written, allows MMS the latitude to apply the concept of 'marketable' in a fair and correct manner, now and in future gas markets.

53 FR 1243 (emphasis added). Hence, as announced within the Federal Register, MMS understood that the critical inquiry with respect to any marketable condition analysis is to determine when the gas is "sufficiently free from impurities and otherwise in a condition that [it] will be accepted by a purchaser under a sales contract typical for the field or area"—an inquiry that, MMS acknowledged, would vary in "dynamic" gas markets. Therefore, any Order issued

---

[2] The current version of the rule, which is unchanged in substance, appears at 30 CFR § 1206.151.

by MMS or its successor, ONRR, that alleges a failure to understand or apply the marketable condition rule should necessarily include a factual basis supportive of the agency's conclusions concerning sales contracts "typical for the field or area."

10.     Moreover, pursuant to a number of federal administrative law decisions, an agency is obligated to examine the relevant factual information and to articulate a rational connection between the facts found and the choice made.  An agency rule is necessarily arbitrary and capricious if the agency ignores facts or offers an explanation for its decision that runs counter to the facts.

11.     In turn, pursuant to 30 CFR § 206.152(i), "[t]he lessee must place gas in marketable condition and market the gas for the mutual benefit of the lessee and the lessor at no cost to the Federal Government."  BROG does not challenge in this action the enforceability of that "marketable condition rule."  Instead, BROG challenges the agency's efforts—contrary to the regulations—to expand the scope of the marketable condition rule.  BROG also challenges the agency's failure—in disallowing certain expenses as necessary to place the gas at issue in marketable condition—to conduct an actual, factual investigation concerning the purpose of each disallowed service, whether removal of hydrogen sulfide ("$H_2S$"), dehydration, compression, gathering, or other expenses frequently incurred by lessees.

The Deliberate Departure of MMS and ONRR From That Regulatory Framework

12.     In 2005, the D.C. Circuit Court of Appeals decided *Amoco Prod. Co. v. Watson,* 410 F.3d 722, 725 (D.C. Cir. 2005).  *Amoco* involved an effort by MMS to disallow expenses associated with removal of $CO_2$ from coalbed methane production[3] in the San Juan Basin.  The

---

[3] Coalbed methane is a type of natural gas that contains extremely few heavier hydrocarbons, such as propanes or butanes.  Unlike much conventional natural gas, therefore, coalbed methane is not processed for the purpose of extracting NGLs.

D.C. Circuit affirmed MMS's Order disallowing those expenses after concluding that a sales contract typical for the purchase of coalbed methane from the San Juan Basin involved post-$CO_2$ removal gas.

13.     In 2008, the D.C. Circuit Court of Appeals decided *Devon Energy Corp. v. Kempthorne,* 551 F.3d 1030 (D.C. Cir. 2008). *Devon* involved an effort by MMS to disallow expenses associated with compressing and dehydrating coalbed methane production in Wyoming. In that case, the D.C. Circuit affirmed MMS's Order disallowing those expenses after concluding that a sales contract typical for the purchase of coalbed methane from Wyoming involved gas acceptable to a downstream interstate pipeline.

14.     Having thus won twice before the D.C. Circuit Court of Appeals in relation to its efforts to disallow certain expenses pursuant to coalbed methane market evidence in the San Juan Basin and in Wyoming that supported the conclusion that "marketable condition" was achieved only when the condition of the gas would be acceptable to a downstream interstate pipeline, MMS embarked upon a far-reaching campaign to redefine the marketable condition of all gas as being gas of downstream "pipeline quality," irrespective of (1) whether the gas at issue was coalbed methane or conventional gas, (2) whether the gas at issue was processed for the extraction of NGLs, and (3) the market in which the gas was produced and sold. Through that artifice of establishing a uniform marketable condition for all gas, MMS would be in a position to avoid fact-intensive (and expensive) investigations of widely varying circumstances in different markets, and instead declare—also uniformly—that all expenses incurred prior to the attainment of "pipeline quality" must necessarily be disallowed.

15.     In documents obtained by BROG via Freedom of Information Act requests, ONRR produced a number of slides that demonstrate the agency's intent to promote a per se

understanding of the marketable condition rule that disregards the facts and circumstances of individualized markets for natural gas.  In an October 21, 2008 Meeting of MMS's "Unbundling Team" for example, MMS presented to its auditors a PowerPoint presentation that included the following slides:

> Treating gas to put it into marketable condition involves:
> . . .
> Compression—means the process of raising the pressure of the gas . . .
> Dehydration—the removal of water vapor
> Removal of acid gases—usually called "sweetening" and the removal of hydrogen sulfide or carbon dioxide
> Lessees must compress, gather, and dehydrate gas at no cost to the lessor.
> Lessees must remove sulphur (sweeten) and carbon dioxide ($CO_2$) at no cost to the lessor.

(emphasis added).  That understanding is not only contrary to law; it expressly contrary to the agency's own Meeting Notes from its April 29, 2008 RPC Valuation Oil & Gas Subcommittee which expressly reflect that "[t]here is no bright line that determines whether transportation and processing costs are deductible," and its admission that "[t]he functional aspects of why gas is compressed and dehydrated drive deductibility from royalty."

MMS's Orders and the Agency-Level Review of Those Orders

16.   Consistent with the understanding that supported its Unbundling Team PowerPoint slides, MMS's Orders of February 28, 2008 and February 29, 2008 determined that BROG had taken deductions from royalty that should be disallowed, as BROG had allegedly failed to understand its obligation to place the gas at issue into "marketable condition."  Each Order specifically explained that (1) removal of hydrogen sulfide (or "sweetening") (2) dehydration, and (3) gathering and compression utilized to transport the gas to the Grasslands Plant were expenses necessary to place the gas into marketable condition, even though the Orders failed to support their stated conclusions with facts of any kind.

17.     BROG timely commenced agency level appeals of each of the Orders.  In MMS-08-55-O&G, ONRR issued an October 27, 2011 Order in which it reiterated—much as it appeared upon the Unbundling Team PowerPoint slides—that "[t]reating gas to put it into marketable condition includes gathering . . . compression, dehydration, and sweetening."  The cited legal support for that erroneous conclusion was also predictable: the decisions in *Amoco* and *Devon*.  The Orders also omitted any facts related to the actual purpose served by each disallowed expense of sweetening, dehydration, gathering and compression.  The agency denied BROG's appeal.  A similar November 29, 2011 Order followed in MMS-08-54-O&G.  Again, BROG's appeal was denied.

BROG's Appeals to the IBLA, and the IBLA Decision

18.     BROG timely commenced appeals to the IBLA of each of those agency Orders, and transmitted Statements of Reasons for each.  In its arguments to the IBLA, BROG noted the following errors: First, the removal of $H_2S$ and dehydration at issue occur <u>inside the Plant fenceline</u> at the Grasslands Plant.  That fact, in turn, has two material implications, as confirmed by a letter from ORM that is part of record evidence: (1) those services occur <u>after</u> the sale at the wellhead, meaning that BROG was not required to perform those services in order for the gas to be acceptable to ORM as buyer; and (2) those services occur immediately prior to cryogenic processing at the Grasslands Plant, making them integral to processing, which is an allowed expense when gas is sold at the wellhead pursuant to a POP contract.[4]  Second, ORM's use of compression as part of its gathering system is neither designed nor intended to pressurize the gas at issue to interstate pipeline pressures.  Instead, compression is utilized (1) to permit cryogenic

---

[4] Allowable processing expenses are necessarily embedded in the terms of POP contracts, which are expressly recognized by the terms of 30 CFR § 206.152(a) as a valid means of selling federal gas production.

processing to occur, and (2) to transport production to the Grasslands Plant for processing. For those reasons, none of the expenses placed at issue by the Orders is a cost of placing gas in marketable condition. Rather, each is integral to either processing or transportation, and each is an authorized deduction from the value on which royalty is payable.

19.     The IBLA's April 23, 2013 Order (attached as Exhibit 1) nonetheless affirmed ONRR's decisions. Without consideration of the facts, the IBLA held that "the fact that the initial purchaser was willing to accept the gas in its untreated state, before being compressed, dehydrated, and/or sweetened, did not mean that it was not necessary to treat the gas in order to place it in a 'marketable condition.'" (Order at 17 (citing *Amoco*)). Of course, the fact that ORM was willing to accept the gas prior to any compression, dehydration, and sweetening is some evidence of prevailing market conditions—and certainly sufficient evidence to have caused ONRR to investigate and to articulate a factual basis supportive of its contrary conclusion. Yet, ONRR never did either.

20.     Then, in an apparent effort to remedy ONRR's failure to develop a factual record supportive of its position concerning gas contracts "typical for the field or area," the IBLA wrongly determined that the burden of proof with respect to such issues was on BROG:

> BROG fails to offer any affirmative evidence in support of its assertion that costs of compression, dehydration, and sweetening were not necessary to place the gas in marketable condition or that the gas was already marketable prior to compression, dehydration and sweetening. <u>ONRR's determination that the costs were necessary to place the gas in marketable condition and royalty-bearing was based on a thorough State audit.</u> <u>The burden rests properly on the lessee to demonstrate that these costs were not necessary to place the unprocessed gas in marketable condition and incurred only to transport and process its gas.</u>

(Order at 20 (emphasis added)).

21.     In fact, the IBLA's Order misstates both the nature of the State audit and the legal burden. As reflected in the administrative record, the State of North Dakota engaged in no

meaningful review of marketing practices "under a sales contract typical for the field or area," as required by § 206.151. Nor did ONRR. Nor did either seek to determine the actual purposes served by the disallowed expenses. Hence, irrespective of whether the North Dakota audit was "thorough," no entity involved in promulgating the orders at issue in fact engaged in the necessary review of facts, or any effort to support its conclusions with actual facts. Instead, the State of North Dakota merely advanced the same theory adopted by MMS following *Amoco* and *Devon*: Gas is never marketable until in a condition acceptable to a downstream pipeline.

22.     Still, the IBLA proceeded further to announce a new (and unsupported) principle of law. The IBLA conceded that the gas, as it exists at the wellhead, was acceptable for the purchase by ORM, but nonetheless—and to BROG's knowledge, for the first time in the history of its decisions—effectively eliminated the significance of the role of the midstream industry that purchases gas production at the wellhead across the United States on both federal and private leases:

> It is only after the unprocessed gas is compressed, dehydrated, and sweetened, in order to render it suitable for processing, and then processed by [ORM], that it is, in fact, <u>acceptable to the ultimate third-party purchaser</u>. While the unprocessed gas is accepted for initial purchase by [ORM], <u>which essentially acts as an intermediary in the sale of unprocessed gas</u>, it is only after the gas has been processed by [ORM], which first necessitates compression, dehydration, and sweetening, <u>that it is marketable to the ultimate purchaser</u>.

(Order at 20 (emphasis added)). Those conclusions are objectionable for multiple reasons. First, they profoundly misunderstand the role of the midstream industry, and reduce companies such as ONEOK, DCP Midstream, Dynegy, Targa, Enterprise, Atlas, Kinder Morgan, Eagle Rock and countless others to mere "intermediaries" whose decisions to purchase gas are now deemed to be of no consequence to the producer, even if title to the gas transfers for value at the wellhead. Second, they effectively determine that the only purchasers of gas who matter when determining

whether gas is in marketable condition are "ultimate purchasers," by which the IBLA means "end users of residue gas." Such an approach is necessarily contrary to § 206.151, which specifies that the appropriate inquiry is when gas is "accepted by a purchaser under a sales contract typical for the field or area."

23.     Viewed through the lens of its holdings concerning the "ultimate purchaser," it is easy to understand why the IBLA concluded that BROG had offered no evidence supportive of its contention that the gas as it exists at the wellhead is in marketable condition. (Order at 21). BROG has not offered that evidence because BROG does not contend that gas at the wellhead is invariably acceptable, for example, to a residential end user operating a gas furnace. But whether gas at the wellhead is acceptable to a residential end user is simply not the applicable standard of law, as announced by the regulations. Instead, the IBLA has entirely failed to apply § 206.151, and has failed to require ONRR to apply the language of that regulation.

24.     Nor did the IBLA's Order obligate ONRR to determine the actual purpose of the disallowed expenses. Instead, the Order relieved the agency of that clear obligation through attempted distinguishing of long-standing IBLA decisions and additional shifting of the burden of proof. The IBLA's refusal to apply and to enforce its own precedential decisions is also arbitrary and capricious.

### Claim for Declaratory Judgment

25.     Pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706, an actual controversy exists between DOI (as evidenced by the actions of both ONRR and the IBLA) and BROG concerning both the meaning of regulations that govern the valuation of natural gas produced from federal leases and the proper application of the decisions in *Amoco* and *Devon* outside of the context of coalbed methane production. A judicial declaration concerning whether DOI abused its discretion or otherwise acted arbitrarily, capriciously, or with apparent disregard for governing

decisions of the IBLA and federal courts is both appropriate and necessary to determine the validity of the underlying Orders.

26.     By applying a version of marketable condition rule that is contrary to applicable regulations—and that is instead expressly premised upon an unsustainable reading of the results in *Amoco* and *Devon*—the IBLA necessarily rendered an incorrect decision that must be vacated as manifestly contrary to law. Simply stated, neither ONRR nor the IBLA asked the required questions, because both simply <u>assumed</u> (1) that the gas could not have been marketable until acceptable to a downstream third-party purchaser, and (2) that all expenses incurred prior to attainment of "pipeline quality" must necessarily have been utilized to place the gas in marketable condition. The Court should reject those entirely false legal premises as a matter of law.

## Request for Relief

27.     In connection with its requested declaratory judgment, BROG asks the Court to grant its appeal in these matters, to reject DOI's position, and to provide the following specific relief:

A.     Declare that the marketable condition rule applicable to federal gas production cannot be reconciled with the assumption—unsupported by evidence—made by ONRR and the IBLA that gas is never in marketable condition until acceptable to a downstream pipeline;

B.     Declare that, pursuant to the marketable condition rule applicable to federal gas production, wellhead sales of gas production to a midstream purchaser are valid and cognizable sales of gas for the purpose of determining when gas is "sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field or area" pursuant to § 206.151;

C.      Declare that, when applying the marketable condition rule applicable to conventional gas production that is processed, ONRR must undertake a factual evaluation of the actual purpose served by each expense that the agency seeks to disallow, and that the agency may not simply disallow all expenses as necessary to place gas into the relevant marketable condition;

D.      In the event the Court determines that ONRR bears the burden of proof with respect to any determination of when federal gas production is in marketable condition, vacate all portions of ONRR's Orders that purport to require BROG to increase the value of production on which royalty is due to the federal lessor;

E.      In the event the Court determines that BROG bears the burden of proof with respect to any determination of when federal gas production is in marketable condition, remand this dispute to the agency level with a directive to ONRR to permit BROG sufficient time to develop and introduce evidence into the administrative record concerning marketing arrangements "typical for the field or area" pursuant to § 206.151;

F.      As a consequence of the IBLA's interjection into the action of the entirely novel concept that midstream companies are mere "intermediaries" whose purchases of gas at the wellhead may be disregarded when determining which contracts are "typical for the field or area," authorize BROG to supplement the administrative record with contrary evidence;

G.      Award to BROG, pursuant to 28 U.S.C. § 2412(b), reasonable attorney fees and permissible costs incurred in the prosecution of this action;

H.      Grant such other relief as may be appropriate under the circumstances.

Respectfully submitted,

_Bradley Welsh_

Dennis C. Cameron, OBA #12236
Bradley W. Welsh, OBA #18488
GABLE & GOTWALS
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, OK  74103-4217
(918) 595-4800
(918) 595-4990 (fax)
**Attorneys for Burlington Resources
Oil & Gas Company LP**



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
801 N. Quincy Street, Suite 300
Arlington, Virginia 22203



703-235-3750                    703-235-8349 (fax)


## BURLINGTON RESOURCES OIL & GAS CO.

IBLA 2012-96 & 2012-159                    Decided April 23, 2013

Appeal from decisions of the Director, Office of Natural Resources Revenue, ordering the lessee to pay additional royalties on natural gas produced and sold from onshore Federal oil and gas leases. MMS-08-0054-O&G; MMS-08-0055-O&G.

Affirmed.

1.  Federal Oil and Gas Royalty Management Act of 1982: Royalties--Federal Oil and Gas Royalty Simplification and Fairness Act: Rule of Decision

    Section 4(a) of FOGRSFA, 30 U.S.C. § 1724(h) (2006), requires the Secretary of the Interior to issue a final decision concerning an administrative appeal from an order to pay additional royalties within 33 months following commencement of the administrative proceeding. The 33-month time frame may be extended by any period of time agreed upon in writing by the parties. Where the parties have agreed to 39+ months of extensions in an administrative appeal, and a total of 25 months have elapsed since the conclusion of the 33-month time frame, approximately 15 months remain for issuance of a final decision by the Board.

2.  Federal Oil and Gas Royalty Management Act of 1982: Royalties--Mineral Leasing Act: Royalties--Oil and Gas Leases: Royalties: Generally--Statute of Limitations

    The Office of Natural Resources Revenue (ONRR) is required by section 115(b) of FOGRMA, 30 U.S.C. § 1724(b) (2006), to demand payment for royalty owed but not paid within 7 years from the date the obligation to pay the royalty becomes due. Under 30 U.S.C. § 1724(d) (2006), that statutory time period may be tolled by

written agreement between the United States and the lessee or its designee. Where the parties have executed a written agreement tolling the running of the § 1724(b) statute of limitations to permit settlement negotiations, and agreed that tolling shall continue until 120 days after either a settlement agreement has been signed by the parties or a written notice of termination of settlement negotiations has been sent by one of the parties, and ONRR terminates the settlement negotiations and thus the tolling, in the absence of a showing of error, the Board will affirm a decision by the Director of ONRR computing the statutory 7-year period or the succeeding tolling period, and his determination of the applicable production months for which ONRR is barred from collecting additional royalties.

3.    Federal Oil and Gas Royalty Management Act of 1982: Royalties--Mineral Leasing Act: Royalties--Oil and Gas Leases: Royalties: Generally

A Federal or Indian lessee must put unprocessed gas in marketable condition at no cost to the lessor. When unprocessed gas must be compressed, dehydrated, and sweetened in order to render it suitable for processing and acceptable to a third-party purchaser, those costs are necessary to place the gas into a marketable condition and must be included in gross proceeds for purposes of royalty calculation.

APPEARANCES: Dennis C. Cameron, Esq., Bradley W. Welsh, Esq., Tulsa, Oklahoma, for appellant; Matthew E. Fox, Esq., Office of the Solicitor, U.S. Department of the Interior, Washington, D.C., for the Office of Natural Resources Revenue.

OPINION BY ADMINISTRATIVE JUDGE ROBERTS

Burlington Resources Oil & Gas Co. (BROG)[1] has appealed from two decisions of the Director, Office of Natural Resources Revenue (ONRR), ordering it to pay

---

[1] On Mar. 31, 2006, BROG was acquired by and is now a wholly-owned subsidiary of ConocoPhillips Company. *See* http://www.conocophillips.com/EN/about/who_we_are/history/burlington/Pages/index.aspx (last visited Jan. 4, 2013).

additional royalties for natural gas produced and sold from onshore Federal oil and gas leases.[2]

In the first decision, issued October 27, 2011, the Director upheld in part and rescinded in part an Order to Perform Restructured Accounting and Pay Additional Royalties (Order to Perform), issued by ONRR on February 28, 2008, requiring BROG to pay additional royalties with respect to natural gas produced and sold from 102 Federal leases in the State of North Dakota, from January 1, 1998, to December 31, 1999.[3] BROG was required to report and pay $3,984.36, for selected sample months during the audit period, as determined by State auditors and confirmed by ONRR, to correct for the valuation errors detected by audit, and then compute and pay the additional royalties for the remainder of the audit period. BROG was required to compute and pay these additional royalties within 60 days of receipt of the Order to Perform, i.e., March 1, 2008.

In the second decision, issued November 29, 2011, the Director upheld in part and rescinded in part an Order to Report and Pay Additional Royalties (Order to Pay), issued by ONRR on February 29, 2008, requiring BROG to pay additional royalties with respect to natural gas produced and sold from 84 Federal leases in the State of North Dakota, from November 1, 1990, to August 31, 1996, and from January 1, 2000, to November 30, 2002.[4] The additional royalties deemed to be due

---

[2]  By order dated May 17, 2012, we consolidated the two appeals, since they arise from the same basic facts and raise related questions of fact and law. The appeals are taken from decisions of the Director of ONRR that resolved appeals that had been pending before the Minerals Revenue Management Program, Minerals Management Service (MMS) (now ONRR). For the sake of clarity, all references herein to ONRR refer, as appropriate, to ONRR and its constituent agencies, and to its predecessor MMS and its constituent agencies.

[3]  BROG's appeal to the Director of ONRR from the Feb. 28, 2008, Order to Perform was serialized by ONRR as MMS-08-0055-O&G (hereinafter, MMS-0055). The Director issued a decision in MMS-0055 on Oct. 27, 2011. BROG's appeal to the Board from this decision was docketed as IBLA 2012-96. In appealing to the Board from the Director's decision in MMS-0055, BROG stated that the statement of reasons (SOR) it originally filed with the Director would suffice as its SOR to the Board in that case. We will refer to this SOR as "SOR (IBLA 2012-96)."

[4]  BROG's appeal to the Director from the Feb. 29, 2008, Order to Pay was serialized by ONRR as MMS-08-0054-O&G (hereinafter, MMS-0054). The Director issued a decision in MMS-0054 on Nov. 29, 2011. BROG's appeal to the Board from this
(continued...)

IBLA 2012-96 & 2012-159

had already been determined by State auditors and confirmed by ONRR.  BROG was required to report and pay that amount ($141,956.92) within 30 days of receiving the Order to Pay, *i.e.*, by April 4, 2008.

For the following reasons, we conclude that the Director properly upheld both Orders requiring BROG to pay additional royalties.  We therefore affirm the Director's decisions.[5]

## BACKGROUND

During the periods November 1, 1990, to August 31, 1996, January 1, 1998, to December 31, 1999, and January 1, 2000, to November 30, 2002, ONRR determined, based on an audit conducted by the State of North Dakota pursuant to section 205 of the Federal Oil and Gas Royalty Management Act (FOGRMA), 30 U.S.C. § 1735 (2006), that BROG had underpaid royalties on natural gas produced from Federal oil and gas leases in North Dakota.  The unprocessed gas was sold at or near the wellheads to Bear Paw Energy, Inc. (BPE),[6] and Continental Resources, Inc. (CRI).

Following the sale of gas to BPE, the gas was compressed and transported from the leases by pipeline to the Grasslands Plant, which is operated by BPE, where it was treated to remove water (dehydrated) and hydrogen sulfide ($H_2S$) (sweetened).  The gas was then processed into residue gas and natural gas liquids (NGL), which BPE sold at the tailgate of the processing facility, along with a third by-product of processing the gas, *i.e.*, sulfur derived from the $H_2S$.  Following the sale

---

[4] (...continued)
decision was docketed as IBLA 2012-159.  BROG's notice of appeal in IBLA 2012-159 included its SOR for appeal to the Board, which we cite as "SOR (IBLA 2012-159)."

[5] In transmitting the administrative record in each case to the Board, counsel for ONRR declared that the record contained unspecified "documents that are privileged and confidential," which "[should] not . . . be released to any entity other than the parties to this dispute."  Memorandum to the Board from Matthew E. Fox, Esq., Office of the Solicitor, U.S. Department of the Interior, dated Feb. 8, 2012 (MMS-0055); Memorandum to the Board from Fox, dated Mar. 6, 2012 (MMS-0054).  He appears to invoke the confidentiality provisions of 43 C.F.R. § 4.31(a), but he has not substantiated his assertion that the information is "exempt by law" from public disclosure, as required by that rule.  We will not adjudicate this matter in the absence of a proper request.  *See Earth Power Resources, Inc.*, 181 IBLA 94, 101-09 (2011).

[6] BPE is now known as ONEOK Rockies Midstream, L.L.C.  For the sake of clarity, we will continue to refer to BPE.

IBLA 2012-96 & 2012-159

of gas to CRI, the gas was transported from the lease by pipeline to an unidentified facility operated by CRI, where it was processed into residue gas and NGLs for sale to third parties. The unprocessed gas was sold to both BPE and CRI under an arm's-length contract, using a percentage of the proceeds (POP) of the subsequent third-party sales at the tailgate of the processing facility as the contract price paid to BROG for its unprocessed gas.[7]

BROG valued the residue gas, NGLs, and sulfur, for royalty purposes, using the POP paid to it under the arm's-length contracts. To determine the POP paid to BROG under the October 1997 contract, BPE deducted the following costs: (1) a 2.5 cents per thousand cubic feet (Mcf) "treating fee," based on the molecular percentage of acid gas; (2) a 38 cents per Mcf "gathering fee";[8] (3) an allocated share of the cost of compressing the unprocessed gas where the gas was compressed using a compressor not powered by the gas; (4) a "marketing and fractionation fee" of 3.5 cents per gallon deducted from the weighted average price derived from the sale of the NGLs;[9] (5) transportation costs; and (6) an allocated share of the electrical costs of operating the processing facility.[10]

---

[7] The record contains a copy of the Oct. 1, 1997, Gas Gathering, Compression, Processing, Treating and Purchase Agreement between BPE and BROG, but no copy of an agreement between CRI and BROG.

[8] In his decisions resolving BROG's appeals from the February 2008 Orders, the Director acknowledged that the 38 cents per Mcf "gathering fee," which was deducted from BROG's gross proceeds, was properly excluded from the royalty value of the unprocessed gas. See Decision, dated Oct. 27, 2011, at 20, n.15; Decision, dated Nov. 29, 2011, at 23, n.16.

[9] The ONRR Director noted at page 2 of a separate Nov. 29, 2011, decision (MMS-08-0010-O&G), that the 3.5 cents per gallon marketing and fractionation fee was not at issue in the two decisions that are currently before the Board. We thus do not determine the propriety of the fee in the context of the present appeals. We note, however, that, in that separate decision, the Director accepted BROG's representation that $0.030 per gallon was attributable to fractionation and was properly deducted from gross proceeds, and that $0.005 per gallon was attributable to marketing and was not properly deducted from gross proceeds, for purposes of royalty valuation. See id. at 9-10.

[10] In the two subject decisions, the Director acknowledged that the electrical costs of operating the processing facility, which were deducted from BROG's gross proceeds, were properly excluded from the royalty value of the unprocessed gas. See Decision, dated Oct. 27, 2011, at 19; Decision, dated Nov. 29, 2011, at 22.

IBLA 2012-96 & 2012-159

Under 30 C.F.R. § 202.150(b) (2007),[11] the rule in effect at the time of production and sale of the natural gas at issue, BROG was required to pay royalty on all gas produced from a Federal oil and gas lease, except gas unavoidably lost or used on or for the benefit of the lease, including gas used off-lease with Departmental approval. *See also* 30 C.F.R. §§ 206.150 through 206.159 (2007). In valuing unprocessed gas sold under an arm's-length contract for royalty computation purposes, 30 C.F.R. § 206.152 required BROG to value the gas based on the gross proceeds accruing to the lessee from its sale, less appropriate deductions, under 30 C.F.R. §§ 206.156 and 206.157, for the reasonable costs of transporting the gas to a point of sale outside the lease. *See* 30 C.F.R. § 206.151 (*"Gross proceeds"* means the total monies and other consideration accruing to the lessee for the disposition of the unprocessed gas produced from the lease).

To value processed gas sold under an arm's-length contract, 30 C.F.R. § 206.153 required BROG to value the gas based on the combined value of the residue gas and all gas plant products derived from processing the gas, which consisted of the gross proceeds accruing to the lessee from their sale, less appropriate allowances under 30 C.F.R. §§ 206.156 and 206.157 for transportation costs, and under 30 C.F.R. §§ 206.158 and 206.159 for processing costs. The processing allowance was generally limited to 66-2/3% of the value of the gas plant products derived from processing the gas, unless the lessee demonstrated that the actual, reasonable, and necessary processing costs exceeded that limit. *See* 30 C.F.R. § 206.158(c).

BROG was not entitled to deduct from the royalty value of the gas, as determined by the gross proceeds,[12] any of the costs to place the gas in a marketable

---

[11] The regulations, 30 C.F.R. §§ 206.150 through 206.159, promulgated effective Mar. 1, 1988, were redesignated as 30 C.F.R. §§ 1206.150 through 1206.159, effective Oct. 1, 2010, without substantive change. *See* 53 Fed. Reg. 1230, 1272-84 (Jan. 15, 1988); 75 Fed. Reg. 61051, 61072-74 (Oct. 4, 2010). Again, unless otherwise noted, we cite to the 2007 version.

[12] Under 30 C.F.R. § 206.151, the term *"Gross proceeds"* was defined as "the total monies and other consideration accruing to an oil and gas lessee for the disposition of the gas, residue gas, and gas plant products produced." The term "includes, but is not limited to, payments to the lessee for certain services such as dehydration, measurement, and/or gathering to the extent that the lessee is obligated to perform them at no cost to the Federal Government."

condition.[13]  This is because the gas was required to be placed in a marketable condition at no cost to the Federal government under 30 C.F.R. § 206.152(i) and 206.153(i).  *See Amoco Production Co. v. Baca*, 300 F. Supp. 2d 1, 7 (D.D.C. 2003), *aff'd*, 410 F.3d 722 (D.C. Cir. 2005), *aff'd*, 549 U.S. 84 (2006) ("The marketable condition rule is pivotal in the calculation of royalties because it affects the determination of a lessee's gross proceeds, and therefore the value of production [for royalty purposes]").  Such costs have long been considered those for gathering the gas from individual wells at a central point on or near the leases at issue for transportation to market, and for compressing, dehydrating, sweetening, and otherwise treating the gas to put it in a marketable state.[14]

Costs of placing gas in a marketable condition, whether they are incurred by the lessee or paid to a third party, may not be deducted from the gross proceeds accruing to the lessee.  Thus, where such costs are deducted from the monies paid to the lessee by the purchaser of its gas, they must be added to the monies to the lessee for properly determining the gross proceeds accruing to the lessee.  Such costs arise from "the responsibility of the lessee to place the gas in [a] marketable condition or to market the gas."[15]  30 C.F.R. § 206.152(i) (unprocessed gas);[16] *see* 30 C.F.R.

---

[13]  Also under § 206.151, "*Marketable condition*" was defined as "lease products which are sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field or area."  The regulatory language requiring gas from Federal leases to be placed in a marketable condition without cost to the Federal government dates from 1988.  *See* 53 Fed. Reg. at 1275, 1277.  It reflects a longstanding principle of royalty valuation, which holds that, being contractually obligated to market the gas produced from its Federal leases, the Federal lessee is required to place the gas in a marketable condition at no cost to the Federal government. *See, e.g., Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1036-38 (D.C. Cir. 2008), *cert. denied*, 130 S. Ct. 86 (2009); *California Co. v. Udall*, 296 F.2d 384, 387-88 (D.C. Cir. 1961); *The Texas Co.*, 64 I.D. 76, 79 (1957); *see also* 43 C.F.R. § 3162.7-1(a).

[14]  The Director noted that while it appeared BROG had been permitted by ONRR to deduct more than was permitted in terms of the costs of extracting sulfur, he would not set aside the February 2008 Orders and remand them for correction of that error "in view of the marginal difference it would make in the royalty calculations." Decision, dated Oct. 27, 2011, at 20 n.14; Decision, dated Nov. 29, 2011, at 22 n.15.

[15]  The court in *Amoco Production Co. v. Watson*, 410 F.3d 722, 725-26 (D.C. Cir. 2005), *aff'd*, 549 U.S. 84 (2006), afforded the following example:

(continued...)

IBLA 2012-96 & 2012-159

§ 206.153(i) (processed gas); *e.g., Amoco Production Co. v. Baca*, 300 F. Supp. 2d at 7 ("[R]oyalties are due on the value of the gas in a certain condition—marketable condition—whether or not the producer pays the necessary conditioning costs directly or indirectly"), 12 ("The marketable condition rule anticipates and prohibits the type of arrangements . . . wherein producers offer reduced prices to purchasers who in turn incur the costs of placing gas in marketable condition"); *AnSon Co.,* 145 IBLA 221, 226 (1998); *Branch Oil & Gas Co.*, 143 IBLA 204 (1998); *Texaco Inc.,* 134 IBLA 109 (1995); *R. E. Yarbrough & Co.*, 122 IBLA 217 (1992).

For unprocessed gas sold under an arm's-length POP contract, where the gross proceeds received by the lessee consist of the POP received for residue gas and other constituent products *after processing by the purchaser*, the rule at 30 C.F.R. § 206.152 for valuing unprocessed gas applies.[17] *See* 30 C.F.R. § 206.152(a)(1). BROG's POP contracts with BPE and CRI appear to fall into this category. *See* 30 C.F.R. § 206.152(b)(1)(i) and (h). In addition, 30 C.F.R. § 206.152(b)(1)(i) provides that "the value of production, for royalty purposes, shall never be less than a value equivalent to 100 percent of the value of the residue gas attributable to the

---

[15] (...continued)

> [I]f it costs $20 to put gas in marketable condition by removing impurities, and the purified gas is sold for $100, "gross proceeds" for purposes of royalty calculations is $100, regardless of whether the producer removes the impurities and sells the gas for $100, or instead sells the gas for $80 to a purchaser who then removes the impurities.

[16] In defining the duty imposed on the lessee in the sale of unprocessed gas, 30 C.F.R. § 206.152(i) has long provided that,

> [w]here the [royalty] value established under this section is determined by a lessee's gross proceeds, that value will be increased to the extent that the gross proceeds have been reduced because the purchaser, or any other person, is providing certain services the cost of which ordinarily is the responsibility of the lessee to place the gas in [a] marketable condition or to market the gas.

[17] Before the amendment, such gas products had been valued under the rules for processed gas. The regulation at 30 C.F.R. § 206.152 was amended effective Nov. 1, 1991, to specifically apply the rules for valuing unprocessed gas by a lessee pursuant to an arm's-length POP contract. *See* 56 Fed. Reg. 46527, 46530 (Sept. 13, 1991). In appealing from the ONRR Director's November 2011 decision, BROG expressly does not challenge the applicability of the unprocessed gas valuation rules. *See* SOR (IBLA 2012-159) at 2 n.1. Since no similar statement is found in SOR (IBLA 2012-96), BROG appears to object to the applicability of these rules to its appeal from the Director's October 2011 decision.

processing of the lessee's gas." The ONRR Director explains that this means that "the value of gas sold under an arm's-length POP contract is the greater of the lessee's gross proceeds under the POP contract and the value of 100 percent of the residue gas." Oct. 27, 2011, Decision at 5.

ONRR decided in the February 2008 Orders that, during the various time periods in question, as determined by State audit, BROG had computed royalties based on the value of the natural gas as defined by BPE or CRI, without undertaking to determine whether the gas was in fact being valued on the basis of the higher of the gross proceeds received or 100% of the value of the residue gas attributable to the processing of the gas, as required by 30 C.F.R. § 206.152. ONRR further decided that BROG had improperly deducted the costs to compress, dehydrate, and sweeten the gas, to place the gas in a marketable condition. It noted that BROG had therefore taken unallowable deductions in valuing the gas for royalty purposes.

In both Orders, ONRR required BROG to pay the additional royalties already determined by State audit to be due by applying the appropriate royalty computation methodology, and in the case of the February 28 Order to Perform, to also apply the appropriate royalty computation methodology throughout the January 1, 1998, to December 31, 1999, time period, computing and paying any additional royalties found to be due. It thus required a restructured accounting, which consisted of properly determining the gross proceeds received on the sale of the gas by adding back the costs of compressing, dehydrating, and sweetening the gas, and of comparing its recalculated gross proceeds with 100% of the value of the residue gas attributable to processing by BPE and CRI, using the higher of the two to value the gas, for royalty purposes. ONRR further stated that failure to comply would subject BROG to civil penalties, pursuant to section 109 of FOGRMA, 30 U.S.C. § 1719 (2006), and 30 C.F.R. Part 241, Subpart B (2007). It required BROG to continue to report and pay royalties in accordance with the dictates of the Order, stating that any future violation would be deemed a willful violation under 30 C.F.R. Part 241, Subpart B. Finally, ONRR stated that it would bill BROG for the applicable late-payment charges as required by 30 C.F.R. § 218.102, after receiving the additional royalties.

BROG timely appealed both Orders to the Director pursuant to 30 C.F.R. Part 290, Subpart B.[18] In his October and November 2011 decisions, the Director

---

[18] The current appeal regulations found at 30 C.F.R. Part 1290 are redesignations of the former rules in 30 C.F.R. Part 290, Subpart B, that were adopted, effective Oct. 1, 2010, without substantive change. *See* 75 Fed. Reg. 61051, 61093 (Oct. 4, 2010). Unless otherwise noted, our citations to the regulations at 30 C.F.R. Part 290,

(continued...)

IBLA 2012-96 & 2012-159

modified the Orders to require total combined payment of $135,763.45 (*i.e.*, $3,640.59 under the modified Order to Perform (MMS-0055), and $132,122.86 under the modified Order to Pay (MMS-0054), for natural gas produced November 1, 1990, to August 31, 1996; March 1, 1998, to December 31, 1999; and January 1, 2000, to November 30, 2002.  He also adjusted the period for performance of restructured accounting and payment of additional royalties under the modified Order to Perform (MMS-0055) from March 1, 1998, to December 31, 1999.

BROG timely appealed the Director's October and November 2011 decisions to the Board pursuant to 30 C.F.R. § 1290.108.  BROG challenges the Director's denial of its appeal from ONRR's two Orders, but does not challenge the Director's modification of the Orders.

### THE BOARD'S AUTHORITY TO ISSUE A FINAL DECISION

Before we proceed to address the merits of the two appeals, we will first address the issue of whether the appeals have been resolved, by operation of law, pursuant to section 4(a) of the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 (FOGRSFA), Pub. L. No. 104-185, 110 Stat. 1700, 1704.[19]

[1]  In pertinent part, section 4(a) of FOGRSFA requires the Secretary of the Interior to issue a final decision concerning an administrative appeal from an order to pay additional royalties within 33 months following commencement of the administrative proceeding.[20]  *See* 30 U.S.C. § 1724(h) (2006); *see also* 43 C.F.R.

---

[18]  (...continued)
Subpart B are to the 2007 version.

[19]  Section 4(a) of FOGRSFA was enacted by Congress on Aug. 13, 1996, adding section 115 of the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA), which is now codified at 30 U.S.C. § 1724 (2006).

[20]  Under 30 U.S.C. § 1724(h)(1) (2006), the 33-month time frame for final action in an "administrative proceeding" begins when the proceeding "commenced."  An "administrative proceeding" is statutorily defined as any Department agency process "in which a demand, decision or order issued by the Secretary . . . is subject to appeal or has been appealed."  30 U.S.C. § 1702(18) (2006).  The Department has long provided, in the case of a royalty order, that the administrative proceeding commences when the order has been appealed.  *See* 43 C.F.R. § 4.904 ("If you filed your Notice of Appeal under 30 CFR part 290, subpart B, your appeal commenced on the date [ONRR] received your Notice of Appeal").  However, the Federal circuit court in *Murphy Exploration and Production Co. v. U.S. Dep't of the Interior*, 252 F.3d

(continued...)

§§ 4.904 and 4.906; *California State Controller*, 166 IBLA 5, 10-12 (2005).  The 33-month deadline is subject to extension by written agreement of the parties.  *See* 30 U.S.C. § 1724(h)(1) (2006); 30 C.F.R. § 290.109 (now 30 C.F.R. § 1290.109); 43 C.F.R. § 4.909; *California State Controller*, 166 IBLA at 12.  However, absent any extension or upon the expiration of any extension, the Secretary's failure to take final action on the pending appeal within the statutory time frame results in the appeal being deemed to have been resolved by operation of law in favor of the Secretary, thereby affording the aggrieved party the right to seek judicial review.  *See* 30 U.S.C. § 1724(h)(2) (2006); 43 C.F.R. § 4.906(a); *California State Controller*, 166 IBLA at 11.[21]

---

[20] (...continued)
473, 481, *modified on other grounds on denial of petition for reh'g*, 270 F.3d 957 (D.C. Cir. 2001), indicates that the regulation ignores the statutory language in providing that the administrative proceeding commences when an order has been issued and is then subject to appeal.

In our May 17, 2012, Order, discussed *infra*, we adopted the commencement date specified by 43 C.F.R. § 4.904, noting however that the statutory deadline would be deemed to have passed in both cases even were we to have considered the time frames in accordance with the language in *Murphy*.  *See* Order, dated May 17, 2012, at 3 n.7.

BROG indicates, in its notices of appeal to the ONRR Director, that it received ONRR's February 2008 Orders on Mar. 7, 2008, whereupon it was entitled to appeal under 30 C.F.R. §§ 290.103(a) and 290.105(a).  *See* Notice of Appeal (MMS-0055), dated Mar. 27, 2008, at 1; Notice of Appeal (MMS-0054), dated Mar. 27, 2008, at 1.  ONRR did not date-stamp BROG's notices of appeal from the Orders.  However, BROG certified to having sent both of the notices to ONRR by overnight delivery on Mar. 27, 2008, a Thursday.  ONRR does not dispute that BROG mailed the notices that day or that ONRR received them, in the normal course of business, the next day.  We thus presume that ONRR received the notices on Mar. 28, 2008, a Friday.

[21] Both the statute and its implementing regulations denote $10,000 as the dividing line between awards in favor of the appellant (when the royalty order involves a "principal amount" at issue less than $10,000), and in favor of the Secretary (when the royalty order involves a "principal amount" of $10,000 or more).  30 U.S.C. § 1724(h)(2) (2006); 43 C.F.R. § 4.906(a).  The two royalty orders at issue provide for the computation and payment of additional royalties based on the results of restructured accounting.  This situation is governed by 43 C.F.R. § 4.906(d), which provides that the "principal amount," for purposes of deciding whether the appeal is decided in favor of the appellant or the Secretary, means "the principal amount *[ONRR] estimates you would be required to pay as a result of the computation required under the order*, plus any amount due stated in the order."  (Emphasis added.)  *See*
(continued...)

IBLA 2012-96 & 2012-159

The rule at 43 C.F.R. § 4.904(d) provides: "Your appeal ends on the same day of the month of the 33rd calendar month after your appeal commenced . . . , plus the number of days of any applicable time extensions." ONRR's administrative record shows that it agreed with BROG to extend this 33-month deadline by 28 months,[22] and in response to show cause orders issued by the Board on May 17 and June 18, 2012, the parties submitted two extension agreements to the Board showing nearly 12 months in further extensions of that deadline.[23] Adding these 39+ months of extensions to the 33-month deadline, which began running in March 2008, a total of 25 months have elapsed which means 15 months or until March 2014 remain for issuance of a final decision by the Board. We now turn to the merits and substantive questions regarding the validity of ONRR's determinations that BROG owes additional royalties.

*ANALYSIS*

The Director of ONRR addressed four basic issues in his October and November 2011 decisions: (1) whether ONRR's February 2008 Orders were timely under the § 1724(b) statute of limitations; (2) whether an August 15, 2007, Settlement Agreement and Mutual Release barred payment of additional royalties for gas produced from November 1, 1990, to August 31, 1996, pursuant to ONRR's February 29, 2008, Order; (3) whether ONRR properly required BROG to pay royalties on the higher of the gross proceeds received on the sale of the unprocessed gas or 100% of the value of the residue gas attributable to processing; and, most importantly, (4) whether ONRR properly required BROG to increase the gross proceeds received on the sale of the gas to BPE by the costs of compressing, dehydrating, and sweetening the gas. We will address these issues in turn.

---

[21] (...continued)
43 C.F.R. § 4.903 ("*Monetary obligation*").

[22] The administrative record provided by ONRR contains copies of the following extension agreements: Agreement (MMS-0055), dated Apr. 10, 2008 (Mar. 30, 2008, to May 29, 2008); Agreement (MMS-0054), dated Apr. 10, 2008 (Mar. 29, 2008, to May 27, 2008); Agreement (MMS-0055 & MMS-0054), dated Aug. 12, 2008 (May 30, 2008, to Feb. 27, 2009); Agreement (MMS-0055 & MMS-0054), dated Feb. 1, 2010 (Jan. 29, 2010, to July 29, 2010).

[23] On June 21, 2012, BROG and ONRR jointly submitted copies of two extension agreements, executed by the parties on Dec. 15, 2010, agreeing to extensions of the 33-month time frame from Dec. 28, 2010, to June 30, 2011, respectively, in the case of MMS-0055 and MMS-0054. They also submitted, on that date, a single extension agreement, dated May 30, 2012, in the case of both MMS-0055 and MMS-0054, agreeing to an additional extension from July 1, 2011, through Nov. 30, 2012.

IBLA 2012-96 & 2012-159

A. *Statute of Limitations*

[2] ONRR is required by section 115(b) of FOGRMA, 30 U.S.C. § 1724(b) (2006), to demand payment for royalties owed but not paid within 7 years from the date the obligation to pay became due.[24] Under 30 U.S.C. § 1724(d) (2006), that statutory time period may be tolled by written agreement between the United States and the lessee or its designee.[25] BROG and ONRR executed a written agreement on December 3, 2003, that tolled the running of the § 1724(b) statute of limitations in order to permit the parties to participate in settlement negotiations. The tolling period would end 120 days after either a settlement agreement had been signed by the parties or a written notice of termination of settlement negotiations had been sent by one of the parties. *See* Tolling and Stay Agreement, dated Dec. 3, 2003, at 1. BROG received ONRR's written notice of termination of settlement negotiations on March 28, 2005. The tolling period ended 120 days thereafter, *i.e.*, on July 26, 2005.

The Director of ONRR concluded, in his October and November 2011 decisions, that the February 2008 Orders were barred by the § 1724(b) statute of limitations to the extent they sought additional royalties for the periods from January 1, 1998, to February 28, 1998, owing to the undervaluation of the gas (Feb. 28 Order), and from January 1, 2000, to January 31, 2001, owing to the underreporting of the volumes of gas (Feb. 29 Order). He concluded, however, that the Orders were timely to the extent they sought additional royalties for the period from March 1, 1998, to December 31, 1999 (Feb. 28 Order), and from January 1, 2000, to November 30, 2002, owing to the undervaluation of the gas, and from February 1, 2001, to November 30, 2002, owing to the underreporting of the

---

[24] The statute, 30 U.S.C. § 1724(b) (2006), provides, in relevant part, that "[a] . . . demand which arises from, or relates to an obligation, shall be commenced within seven years from the date on which the obligation becomes due and *if not so commenced shall be barred.*" (Emphasis added.) A "demand" is defined, in relevant part, to include "an order to pay issued by the Secretary [of the Interior] . . . to a lessee or its designee . . . that has a reasonable basis to conclude that the obligation in the amount of the demand is due and owing[.]" 30 U.S.C. § 1702(23) (2006).

[25] The statute, 30 U.S.C. § 1724(d) (2006), further provides, in relevant part, that the running of the limitations period under subsection (b) "shall not be suspended, tolled, extended, or enlarged for any obligation for any reason by any action . . . other than the following: . . . A written agreement executed during the limitations period between the Secretary . . . and a lessee or its designee . . . shall toll the limitations period for the amount of time during which the agreement is in effect."

volumes of gas (Feb. 29 Order).[26]  He thus modified the Orders to require the payment and computation/payment of additional royalties from March 1, 1998, to December 31, 1999 (Feb. 28 Order); and from January 1, 2000, to November 30, 2002, and from February 1, 2001, to November 30, 2002 (Feb. 29 Order).

    BROG argued on appeal to the ONRR Director that ONRR was not entitled to charge any additional royalties for periods prior to February 28, and 29, 2001, because they were due more than 7 years before the disputed Orders issued.  SOR (MMS-0055) at 2-3 ("Nothing in the record supporting the Order tolls the limitations period beyond the seven years specified by statute"); SOR (MMS-0054) at 3 ("Nothing in the record supporting the Order tolls the limitations period beyond the seven years specified by statute").  The Director responded, however, that BROG failed to take into account the tolling undertaken pursuant to the December 3, 2003, agreement, which was applicable, in certain instances, in the present case.  See Oct. 27, 2011, Decision at 10; Nov. 29, 2011, Decision at 13.  As discussed, the agreement tolled the running of the § 1724(b) statute of limitations with respect to any demand for additional royalties for the period that began on September 1, 2002, and ended on July 26, 2005, which the Director calculated was 1,060 days.

    The Director determined that royalties for production during January and February 1998 under the February 28, 2008, Order were barred by the § 1724(b) statute of limitations because the obligation to pay those royalties accrued respectively on March 2, and 31, 1998,[27] which meant an order to pay additional royalty for those months must have been received by BROG no later than January 26,

---

[26]  The ONRR Director noted, in his Nov. 29, 2011, decision, that the § 1724(b) statute of limitations did not apply to gas produced from Nov. 1, 1990, to Aug. 31, 1996, since FOGRSFA, which was enacted on Aug. 13, 1996, was applicable to production beginning Sept. 1, 1996, and thereafter.  See Decision, dated Nov. 29, 2011, at 7, n.8.  He also noted that the 6-year statute of limitations in 28 U.S.C. § 2415(a) (2006) does not apply at all to ONRR administrative orders requiring the payment of additional royalties.  See id. at 7-8 (citing BP America Production Co. v. Burton, 549 U.S. 84 (2006)).

[27]  The Director noted that, under 30 C.F.R. § 218.50(a), which was promulgated effective Oct. 22, 1984 (49 Fed. Reg. 37336, 37346 (Sept. 21, 1984), and recently redesignated as 30 C.F.R. § 1218.50(a), effective Oct. 1, 2010 (75 Fed. Reg. at 61084)), royalty was due at the end of the month following the month of production and sale, except when that day fell on a weekend or holiday, whereupon royalty was due the first business day of the succeeding month.  In the case of January 1998 production, the end of the following month was Feb. 28, 2008 (Saturday), thus rendering Mar. 2, 1998, the due date, and, in the case of February 1998 production, the end of the following month was Mar. 31, 1998 (Tuesday).

IBLA 2012-96 & 2012-159

2008 (January 1998 production) and February 24, 2008 (February 2008 production), in order to be deemed timely under the statute of limitations and the above-described tolling agreement.[28]  *See* Oct. 27, 2011, Decision at 11.  He therefore determined that BROG was liable for additional royalties only for subsequent months, *i.e.*, for production from March 1998 through December 1999.[29]

In reviewing ONRR's February 29, 2008, Order, the Director determined that the § 1724(b) statute of limitations was tolled only to the extent that ONRR required the payment of additional royalties arising from BROG's failure to properly value the gas produced from its Federal leases, and not from its failure to properly report the volume of gas produced from its Federal leases.  *See* Decision, dated Nov. 29, 2011, at 13-14 ("The Tolling Agreement . . . by its terms applies to 'any claim for under paid royalties relating to the royalty *value* of gas[.]' . . . However, . . . the Tolling Agreement excludes 'issues regarding . . . the volume of gas upon which royalties are due.'" (quoting Tolling and Stay Agreement at 1)).  He therefore concluded that the February 28, 2008, Order was timely with respect to additional royalties for production from and after February 2001 because BROG received that order less than 7 years after the obligation to pay those royalties accrued (*e.g.*, since the obligation to pay royalties for February 2001 accrued on April 2, 2001, a demand for additional royalties would be timely if received by April 2, 2008).  Since the obligations to pay royalty on pre-February 2001 production accrued more than 7 years before the Order was received (*e.g.*, the obligation to pay royalties for January 2001 accrued on February 28, 2001, which meant a timely demand for additional royalties must have been received by February 28, 2008), the Director concluded that the Order was untimely with respect to production for the period from January 2000 through the end of January 2001.

Accordingly, BROG has failed to establish any error in ONRR's computation of the tolling period, applying that period to the § 1724(b) statute of limitations, or determining which months it was barred from collecting additional royalties under the statute of limitations.  We therefore affirm this aspect of the ONRR Director's October and November 2011 decisions.

---

[28]  The actual demands for payment under the February 2008 Orders occurred on the Mar. 7, 2008, date of BROG's receipt of the Orders.  *See* Decision, dated Nov. 29, 2011, at 13.  It is that date that determines the timeliness of the Orders.

[29]  Since ONRR had required the payment of additional royalty in the amount of $343.77 with respect to February 1998 production, the Director subtracted this amount from the specific amount required to be paid, thereby modifying the February 28 Order to require payment only of a total of $3,640.59.

*B.  Settlement Agreement*

BROG argued to the ONRR Director that it was not required to pay additional royalties owed on natural gas produced prior to January 1, 1998, since the underreporting of royalty values on natural gas produced from Federal and Indian leases and resulting underpayment of any royalties owed were resolved (for production, between March 1, 1988, and December 31, 1997) by an August 15, 2007, Settlement Agreement and Mutual Release by and between BROG, the Federal Government, and Indian tribes. BROG asserted that the Agreement resolved the royalty liability, as determined in ONRR's February 29, 2008, Order, for the period from November 1, 1990, to August 31, 1996.

The ONRR Director concluded that the Settlement Agreement precluded the collection of additional royalties arising from the undervaluation of gas produced, but not from the underreporting of volumes of gas produced during the period from November 1, 1990, to August 31, 1996. *See* Decision, dated Nov. 29, 2011, at 8-9, 11, 12, 23. BROG states that it does not dispute this aspect of the Director's November 2011 decision. SOR (IBLA 2012-159) at 2 n.1.

*C.  Obligation to Place Gas in Marketable Condition at No Cost to Federal Government*

Under section 17(b)(1)(A) and (c)(1) of the Mineral Leasing Act, 30 U.S.C. § 226(b)(1)(A) and (c)(1) (2006), royalty on oil and gas produced from an onshore Federal oil and gas lease is properly computed as a percentage of the "amount or value of the production removed or sold from the lease." The statute does not designate a particular methodology for valuing production, but it is well established that the Secretary of the Interior or his delegate is afforded "considerable latitude," under the statute and its implementing regulations, in determining that value for royalty purposes. *Branch Oil & Gas Co.*, 144 IBLA 304, 306 (1998) (citing *Hoover & Bracken Energies, Inc.*, 52 IBLA 27, 33 (1981), *rev'd, Hoover & Bracken Energies, Inc. v. U.S. Dep't of the Interior*, No. 81-461-T (W.D. Okla. Nov. 18, 1981), *rev'd*, 723 F.2d 1488 (10th Cir. 1983), *cert. denied*, 469 U.S. 821 (1984)).

In its February 2008 Orders, ONRR determined that BROG had undervalued the gas produced from the subject Federal leases that was sold to and processed by BPE from January 1, 1998, through November 30, 2002, because it had improperly deducted the costs of compressing, dehydrating, and sweetening the gas from the gross proceeds received on the sale of the unprocessed gas, and thus effectively charged the Federal government with the cost of placing the gas in a marketable

condition.[30]  The Director agreed.  *See* Oct. 27, 2011, Decision at 20; Nov. 29, 2011,
Decision at 22-23.[31]  He noted that, under longstanding Board precedent, although
BPE had deducted those costs from the gross proceeds paid to BROG, it was required
to add these costs to its gross proceeds for royalty valuation purposes.  He specifically
cited a number of Board cases, including cases that had involved arm's-length POP
contracts under which unprocessed gas produced from Federal leases in North
Dakota was sold to BPE's predecessor-in-interest for processing at the Grasslands
Plant.  In those cases, the Board ruled that, while the gas was compressed,
dehydrated, and/or sweetened by the purchaser following the sale of and passage of
title to the gas, the seller/lessee was nonetheless required to add the costs of doing so
to the gross proceeds received by it for purposes of royalty valuation.  Oct. 27, 2011,
Decision at 12-14 (citing, *e.g.*, *Ladd Petroleum Corp.*, 127 IBLA 163, 172 (1993), and
*Apache Corp.*, 127 IBLA 125, 134 (1993)).[32]

    The Director further noted that Federal courts and the Board have long held
that the fact that the initial purchaser was willing to accept the gas in its untreated
state, before being compressed, dehydrated, and/or sweetened, did not mean that it
was not necessary to treat the gas in order to place it in a "marketable condition"
under 30 C.F.R. § 206.151.  *See* Oct. 27, 2011, Decision at 14 (citing, *e.g.*, *Amoco
Production Co. v. Watson*, 410 F.3d at 729-30, and *Bailey D. Gothard*, 144 IBLA 17,
22-23 (1998), *aff'd*, *Gothard v. United States*, No. CV 98-103-BLG (D. Mont. June 29,
1999)).  He thus concluded:  "[T]he fact that [BPE] agreed to accept the untreated
gas does not prove that the untreated gas was in [a] marketable condition."  *Id.*

---

[30]  ONRR indicated that, in valuing the gas sold to and processed by CRI, BROG did
not deduct any of the costs of compressing, dehydrating, or sweetening, and thus did
not charge the Federal government with the costs of placing the gas in a marketable
condition.  *See* Oct. 27, 2011, Decision at 7-9; Nov. 29, 2011, Decision at 9-11.  It
thus reported no unallowable deductions in the case of gas sold to and processed by
CRI.  Nor has BROG, in its appeals to the Board, raised any issues concerning the
proper valuation of gas sold to and processed by CRI.  *See* SOR (IBLA 2012-159) at 2
n.1.

[31]  Since the two decisions are virtually identical to the extent that they discuss the
allowable deductions from gross proceeds, we hereafter cite only to the October 2011
decision.

[32]  The Director noted that, although the royalty valuation periods at issue in *Ladd
Petroleum* and *Apache* mostly predated the current gas royalty valuation regulations,
the applicable regulations required valuation at no less than the gross proceeds
received by the lessee on the sale of the gas, with no deduction for the costs of
placing the gas in a marketable condition.  *See* Decision, dated Oct. 27, 2011, at 13
n.9.

Relying on the Board's decision in *Exxon Corp.*, 118 IBLA 221, 98 I.D. 110 (1991), BROG argued that it was entitled to deduct the costs of dehydrating the produced gas for purposes of royalty valuation. *See* Decision, dated Oct. 27, 2011, at 14-16. The Director distinguished the *Exxon* case, however, noting that the Board had allowed the seller/lessee to deduct the costs of dehydrating the gas because such costs were properly deemed to be processing costs, since dehydration was necessary to process the gas to recover its constituent components (methane, carbon dioxide, nitrogen, and sulfur), and not to place the gas in a marketable condition.[33]  *See Exxon Corp.*, 118 IBLA at 240-44, 98 I.D. at 119-21; *see also Amoco Production Co. v. Watson*, 410 F.3d at 731; *Amoco Production Co. v. Baca*, 300 F. Supp. 2d at 13 (In *Exxon*, the Board "determined that dehydration of the gas at issue was not necessary to satisfy market specifications but rather was performed for the sole purpose of facilitating transportation"). He rejected the Board's characterization of the costs of dehydration as transportation costs, concluding instead that they were *processing costs* and not the costs to put the gas into marketable condition. Oct. 27, 2011, Decision at 16. Whatever the proper characterization, the dehydration costs in *Exxon* were permitted to be deducted from the gross proceeds received by the seller/lessee and deemed not to be royalty-bearing. The Director concluded in the present case, however, that dehydration was necessary to place the unprocessed gas in a marketable condition and that these dehydration costs were royalty-bearing.

Next, the ONRR Director responded to BROG's argument that, as in the Board's decision in *Xeno, Inc.*, 134 IBLA 172 (1995), it was entitled to deduct the costs of compressing the produced gas for purposes of royalty valuation. *See* Oct. 27, 2011, Decision at 16-19. He distinguished the *Xeno* case by noting that the Board allowed the seller/lessees to deduct the costs of compressing the gas because such costs were not considered necessary to place the gas in a marketable condition. Although the gas was sold by the seller/lessees at the wellhead to a gathering system operator, gathered together with other gas from the field and then compressed and resold to a pipeline company at a higher price, a market for the uncompressed gas at the wellhead was shown to exist. *See Xeno, Inc.*, 134 IBLA at 182-84;[34] *Amoco*

---

[33] Unlike the gas now at issue, the gas at issue in *Exxon* was processed gas. *See* 118 IBLA at 223, 224-25, 98 I.D. at 111-12. Under the applicable regulations, the royalty value of that gas was the combined value of the residue gas and other gas plant products, less appropriate deductions for transportation and processing costs, but not less than the gross proceeds received on the sale of the residue gas and other gas plant products. *See* 30 C.F.R. §§ 206.103 and 206.106 (1987).

[34] In *Xeno*, the Board noted that there was evidence that "the pressure of the gas from the wellheads was adequate to gain access to the pipeline market," which was

(continued...)

*Production Co. v. Watson,* 410 F.3d at 730; *Amerada Hess Corp. v. Dep't of the Interior,*
170 F.3d 1032, 1037 (10th Cir. 1999); *Amoco Production Co. v. Baca,* 300 F. Supp. 2d
at 11; *Bailey D. Gothard,* 144 IBLA at 22. The Director recognized that in *Xeno,*
compression was not necessary to place the gas in a marketable condition, because it
was already marketable when it emerged from the wellhead. Thus, the seller/lessees
were entitled to deduct compression costs from the higher resale price for royalty
valuation purposes. In BROG's case, however, the Director concluded that
compression was necessary to place the unprocessed gas in a marketable condition
since "[t]here is no evidence of a competitive market, created by more than one
purchaser, for uncompressed gas at the wellhead." Oct. 27, 2011, Decision at 17. He
therefore concluded that the compression costs were royalty-bearing. The Director
concluded that even though compression, dehydration, and sweetening were
performed at a point after the unprocessed gas left the leasehold, such costs were
necessary to place the gas in a marketable condition and were accordingly
royalty-bearing. *See* Oct. 27, 2011, Decision at 19; Nov. 29, 2011, Decision at 21-22.

BROG makes no real effort on appeal to the Board to demonstrate that
*Exxon, Xeno,* or the other cases distinguished by the ONRR Director, apply as a
factual matter to the present situation. Nor does BROG try to establish that a "true
market," in the form of an "'established demand,'" actually existed for gas in its
uncompressed, undehydrated, and unsweetened condition. *Branch Oil & Gas Co.,*
143 IBLA at 206 (quoting *California Co. v. Udall,* 296 F.2d at 388), 207. Rather,
BROG asserts that the costs of compressing, dehydrating, and sweetening the gas
were not to place the unprocessed gas in marketable condition, but to transport the
gas to the processing facility and to process the gas. *See* SOR (IBLA 2012-96) at 2,
3, 6; SOR (IBLA 2012-159) at 1, 3-4, 9. It argues that ONRR failed to look to the
"substantive reasons *why* the[] expenses [we]re incurred," and to provide
factual support for its determination that the expenses were necessary to place
the unprocessed gas in marketable condition. SOR (IBLA 2012-96) at 4; *see*
SOR (IBLA 2012-159) at 1, 5. BROG states that ONRR was arbitrary and capricious
in adopting a *per se* marketable condition rule under which the costs of compressing,
dehydrating, and sweetening are simply assumed to be necessary to place
unprocessed gas in marketable condition. *See* SOR (IBLA 2012-159) at 1, 4-7.
Rather, BROG states that it was in fact necessary to compress, dehydrate, and
sweeten the subject gas in order to transport it to the processing facility, remove
impurities (water and $H_2S$) that would otherwise impede processing the gas, and

---

[34] (...continued)
reflected in the fact that the seller/lessees had "competing offers to purchase the gas
at the wellhead" from two pipeline companies. 134 IBLA at 183, 184. Thus, the
uncompressed gas was already in a marketable condition.

allow the processing facility to operate properly. *See* SOR (IBLA 2012-96) at 2, 3, 6; SOR (IBLA 2012-159) at 1, 3-4, 9.

BROG argues that the Board should either reverse the ONRR Director's October and November 2011 decisions as arbitrary and capricious, or at least set aside the decisions as unsupported by the record and remand the cases to ONRR for further fact-finding and reconsideration of the question of whether the costs of compression, dehydration, and sweetening are truly costs of placing the unprocessed gas in a marketable condition and properly included in the gross proceeds paid to BROG for purposes of royalty valuation. *See* SOR (IBLA 2012-96) at 6; SOR (IBLA 2012-159) at 10 ("At the very least, the Order at issue should be remanded for the purpose of reviewing the purpose of the fees at issue in more detail"), 11.

BROG fails to offer any affirmative evidence in support of its assertion that costs of compression, dehydration, and sweetening were not necessary to place the gas in marketable condition or that the gas was already marketable prior to compression, dehydration, and sweetening. ONRR's determination that the costs were necessary to place the gas in marketable condition and royalty-bearing was based on a thorough State audit. The burden rests properly on the lessee to demonstrate that these costs were not necessary to place the unprocessed gas in marketable condition and incurred only to transport and process its gas. *See, e.g.*, *Exxon Corp.*, 118 IBLA at 246, 98 I.D. at 122.

[3] It is only after the unprocessed gas at issue is compressed, dehydrated, and sweetened, in order to render it suitable for processing, and then processed by BPE, that it is, in fact, acceptable to the ultimate third-party purchaser. While the unprocessed gas is accepted for initial purchase by BPE, which essentially acts as an intermediary in the sale of the unprocessed gas, it is only after the gas has been processed by BPE, which first necessitates compression, dehydration, and sweetening, that it is marketable to the ultimate purchaser. *See Amoco Production Co. v. Baca*, 300 F. Supp. 2d at 10. In these circumstances, we conclude that ONRR was justified in concluding that by compressing, dehydrating, and sweetening this unprocessed gas, it was placed into "a condition that will be accepted by a purchaser under a sales contract typical for the field or area." 30 C.F.R. § 206.151 ("*Marketable condition*"). BPE's willingness to purchase the unprocessed gas for processing and sale plainly does not establish that market, or demonstrate that this gas was in marketable condition when it was purchased from BROG. *See Amoco Production Co. v. Baca*, 300 F. Supp. 2d at 8-9, 12.

We cannot conclude, as BROG would have us, that, even prior to compression, dehydration, and sweetening, and then processing, the gas "is, at the well, in a condition in which it is *acceptable to a third-party purchaser*." SOR (IBLA 2012-159)

IBLA 2012-96 & 2012-159

at 7 (emphasis added).  At no time has BROG offered any evidence that the unprocessed gas would be acceptable to a typical third-party purchaser at the well, before it has been compressed, dehydrated, sweetened, and then processed.  In this situation, we must agree that those costs are properly viewed as costs necessary to place the unprocessed gas in marketable condition, and thus should be royalty-bearing.  *See, e.g., California Co. v. Udall*, 296 F.2d at 388 ("In the record before us there is no evidence of a market for the gas in the condition it comes from the wells.  The only market, as far as this record shows, was for this gas at certain pressure and certain minimum water and hydrocarbon content.");  *The Texas Co.*, 64 I.D. at 79 ("The lessee has not shown that the gas can be marketed at the pressure with which it comes from the wells").

BROG notes that under the definition of *"Marketable condition"* in 30 C.F.R. § 206.151, lease products are in marketable condition when they are "sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field or area."  It points out that BPE did not require BROG to dehydrate or sweeten the unprocessed gas or require BROG to pay BPE for the costs of doing so prior to the sale to BPE, and that BPE undertook these tasks far from the lease.  Even so, BROG recognizes that the fact that BPE undertook these tasks does not necessarily mean that they were not essential to place the gas in a marketable condition.  *See* SOR (IBLA 2012-159) at 2-3.  It is well established that the initial purchaser's willingness to accept gas that has not been dehydrated and sweetened does not, by itself, establish that dehydration and sweetening are not necessary to place the gas in a marketable condition.

It is equally clear that unprocessed gas may be sold to and then dehydrated and sweetened by an initial purchaser in order to place the gas in a marketable condition, with the purchaser deducting the costs of doing so from the proceeds paid to the seller/lessee for that gas.  In such a situation, ONRR is justified in recognizing that dehydration and sweetening were undertaken to place the gas in a marketable condition, regardless of whether they have occurred before or after transfer of title to the gas, or the seller/lessee has effectively borne the costs of doing so through the reduction in its gross proceeds.  To ensure those costs are not ultimately borne by the Federal government, such costs must be added to the proceeds paid to the seller/lessee, and bear their fair share of the royalty owed.  *See, e.g., Amoco Production Co. v. Watson*, 410 F.3d at 729-30.  In *Bailey D. Gothard*, 144 IBLA at 22, the Board held that "[d]eductions from the value of the gas for the[] expenses [of placing the gas in a marketable condition] are not allowed whether incurred by the lessee or a third party, before or after the initial sale of the gas, when the evidence discloses that this is necessary to market the gas."  That is the situation here.  *See Xeno, Inc.*, 134 IBLA at 180-82.

183 IBLA 353

BROG appears to believe that since the dehydration and sweetening were undertaken immediately prior to processing, at a point beyond the lease, after the point of sale, in order to render the gas suitable for processing, neither sweetening nor dehydration was necessary to place its unprocessed gas in a marketable condition. It notes that gas must be treated to remove $H_2S$, which is a corrosive substance destructive to the processing plant, and water, which would freeze and shut down processing because extracting NGLs from unprocessed gas requires that it be cooled to very low temperatures. *See* SOR (IBLA 2012-159) at 3, 8; Letter to ConocoPhillips from BPE, dated May 20, 2008. All these facts were fully taken into account by ONRR. *See* Order to Perform at 3, and Order to Pay at 4 ("Gas processed through a cryogenic plant must be free of any impurities like water or [$H_2S$] . . . . Since the gas must be free of impurities and water *in order to process it,* sweetening (removal of [$H_2S$]) and dehydration (removal of water) are costs to place the gas in [a] marketable condition" (emphasis added)).

Since it is necessary to remove $H_2S$ and water in order to process the gas and since it is the processed gas (which includes the residue gas and NGLs) that is desirable to typical third-party purchasers, ONRR concluded that it was necessary to dehydrate and sweeten the unprocessed gas in order to place it in a marketable condition. BROG offers no evidence to the contrary. While dehydration and sweetening may be useful for transportation or processing, once it is properly determined that they are principally necessary to place the gas at issue in a marketable condition, they cannot also be the subject of a processing or transportation allowance. *See Devon Energy Corp. v. Kempthorne,* 551 F.3d at 1037 ("[Although] the costs of dehydration and compression can reasonably be interpreted to fall within the compass of 'transportation costs[,]'" ONRR properly held that they "are not deductible if the[] *primary function* [of compression and dehydration] is to prepare the gas to move through the pipelines to the point where gas is purchased" (emphasis added)); *Amoco Production Co. v. Watson,* 410 F.3d at 731 ("The logic of the regulations bars an expenditure to place gas in marketable condition from also being an expenditure deductible from gross proceeds as a transportation cost"); *Amoco Production Co. v. Baca,* 300 F. Supp. 2d at 13 ("[Unlike dehydration in *Exxon,* which did not place the produced gas in a marketable condition,] $CO_2$ removal is essential in the instant case to place gas in marketable condition. *That there exists a corollary benefit in [transporting and] reducing the level of $CO_2$ [at the treatment facility] does not transform what is a marketing cost into a transportation cost.*" (emphasis added)).

BROG further argues that, although the unprocessed gas is compressed in the field, such compression is undertaken for the purpose of rendering the gas suitable for processing, noting that BPE's processing facility, which operates at very low temperatures, "relies upon a significant pressure drop (and temperature drop) in

order to cause natural gas liquids to separate from gas delivered to the plant," which requires gas entering the facility to be "at high pressure[.]"  SOR (IBLA 2012-159) at 4, 9.  This fact was also fully taken into account by ONRR.  *See* Order to Perform at 3-4, and Order to Pay at 4 ("[T]he cryogenic process uses pressure changes to separate the liquids. . . . Compression required *to raise the pressure high enough to enter the processing facility* is a cost to place the gas in [a] marketable condition." (emphasis added)).

Since it is necessary to compress in order to process the gas and since it is the processed gas (which includes the residue gas and NGLs) that is desirable to typical third-party purchasers, ONRR concluded that it was necessary to compress the unprocessed gas in order to place it in a marketable condition.  Again, BROG offers no evidence to the contrary.  Further, while compression may be useful for transportation or processing, once it is properly determined that compression is necessary to place the gas at issue in a marketable condition, it cannot also be the subject of a processing or transportation allowance.

We note that in valuing unprocessed gas for royalty purposes (including gas sold prior to processing under an arm's-length POP contract), a lessee is not permitted, by regulation, to deduct from the gross proceeds the reasonable actual costs incurred by the lessee, or on the lessee's behalf, to process the gas.  *See* 30 C.F.R. §§ 206.153(a) and 206.158(a).  Under no circumstances can the costs of compression, dehydration, and sweetening be deducted as a processing allowance.  However, a lessee is permitted to deduct from gross proceeds the reasonable actual costs it incurred to transport the gas to a point of sale outside the lease.  *See* 30 C.F.R. §§ 206.152(a) and (b)(1)(i), 206.156(a), and 206.157(a)(1)(i).  Such a transportation allowance may include certain costs, including "*[s]upplemental costs for compression, dehydration, and treatment of gas,*" but "only if such services are required for transportation and exceed the services necessary to place production into marketable condition," as required by 30 C.F.R. § 206.152(i).  30 C.F.R. § 206.157(f).[35]  Thus, even were we to conclude that the compression, dehydration,

---

[35]  In proposing 30 C.F.R. § 206.157(f), ONRR explained:

> [ONRR] proposes allowing certain supplemental costs for compression, dehydration, and treatment of gas *only if the transporter requires such services as part of the transportation process.*

> [ONRR] does not allow any costs for compression, dehydration, and treatment of gas for the purpose of placing gas in marketable condition.  It is clear that Federal and Indian lessees must put production in marketable condition at no cost to the lessor . . . .  Therefore, [ONRR] requires the lessee to compress, dehydrate,

(continued...)

IBLA 2012-96 & 2012-159

and sweetening at issue were required for transportation, which has not been proven, we are not persuaded that they exceeded what was necessary to place the gas in a marketable condition.

We further note that the Federal courts have ruled on the deductibility of costs for compression, dehydration, and sweetening in virtually identical circumstances. In *Citation Oil & Gas Corp. v. U.S. Dep't of the Interior* (*Citation v. U.S.*), No. 10-20729, 2011 WL 5025486 (5th Cir. Oct. 21, 2011), Citation sold unprocessed gas produced from Federal oil and gas leases in North Dakota to BPE's predecessor-in-interest (Koch Hydrocarbon Company (Koch)) at or near the wellhead and received a percentage of the proceeds derived from the resale of the gas to third parties. The gas was transported to the Grasslands Plant, where it was treated and processed to recover residue gas, NGLs, and sulfur.[36] *See also* Order and Final Judgment, *Citation v. U.S.*, No. 4:08-cv-01977 (S.D. Tex. Sept. 13, 2010), at 1-2. The costs attributable to compressing and treating the gas were deducted from the gross proceeds received by Citation, and thus excluded from the royalty value of the unprocessed gas. Citation argued that compression and treatment were not necessary to place the gas in a marketable condition, since it was already in a marketable condition at the time of the sale to Koch. *See* 2011 WL 5025486, at *3. This view was rejected by the Fifth Circuit:

---

[35] (...continued)
sweeten, and otherwise treat the gas to place it in the condition necessary to meet typical requirements for gas purchase contracts or pipeline standards. [ONRR] recognizes, however, that there may be unusual circumstances where *the pipeline performs **additional** compression, dehydration, or other treatment of gas to remove impurities during the transportation process.*

Under the proposed rule, if the lessee demonstrates that the costs it incurs for these treatment purposes are not related to the treatment required to put the gas in marketable condition, then the lessee can include these costs in its transportation allowance. [Emphasis added.]

61 Fed. Reg. 39931, 39934 (July 31, 1996). In finalizing the proposed rule, ONRR reiterated: "The costs addressed in the rule are costs that may occur in unusual circumstances where *the pipeline performs additional compression, dehydration, or other treatment of gas for transportation purposes. These costs exceed the services necessary to place production in marketable condition.*" (Emphasis added.) 62 Fed. Reg. 65753, 65759 (Dec. 16, 1997).

[36] We presume that treatment consisted of the same dehydration and sweetening that occurred in the present case at the Grasslands Plant.

183 IBLA 356

IBLA 2012-96 & 2012-159

> We find that Interior's conclusion that compression and treatment costs should not have been deducted from Citation's [gross] proceeds [for royalty valuation purposes] was not arbitrary and should not be set aside. As the district court observed, the price paid to Citation for its casinghead gas was "not based on some index price for casinghead gas. Thus, Citation's contention that the gas clearly was 'marketable,' because someone bought the gas is based on the faulty premise that the casinghead gas was actually purchased for its value as casinghead gas." *Citation Oil & Gas Corp. v. U.S. Dep't of Interior*, 4:08-CV-01977, at 6 (S.D. Tex. Sept. 13, 2010). *In light of the fact that Citation's gas was transferred to Koch under processing agreements, as well as the fact that Citation was paid based on Koch's sales of Citation's dry gas and gas byproducts [after processing], it reasonably follows that the compression and treatment costs . . . were incurred to place the gas in marketable condition.* Thus, the district court properly granted summary judgment in favor of Interior regarding Citation's improper deduction of costs incurred to place its gas in marketable condition. [Emphasis added.]

This holding by the Fifth Circuit supports our ruling that BROG incurred the compression and treatment costs in order to place the gas in marketable condition.

We therefore affirm ONRR's determination that BROG improperly took deductions and undervalued the unprocessed gas that was sold to BPE from the Federal leases at issue during the periods March 1, 1998, to December 31, 1999, and January 1, 2000, to November 30, 2002.

*D.  Failure to Value Gas at Higher of Gross Proceeds and 100% of Value of Residue Gas*

ONRR determined that BROG had undervalued the gas produced from the Federal leases at issue and processed by BPE and CRI, during the periods January 1, 1998, to December 31, 1999, and January 1, 2000, to November 30, 2002, because it had failed to use the higher of the gross proceeds received on the sale of the unprocessed gas and 100% of the value of the residue gas attributable to processing. In his October and November 2011 decisions, the ONRR Director noted that BROG had not challenged ONRR's conclusion that it had failed to compare the gross proceeds received on the sale of unprocessed gas to BPE and CRI with 100% of the value of the residue gas attributable to processing, and had not therefore established any error in ONRR's requirement to pay the higher of the two royalty values for that

IBLA 2012-96 & 2012-159

gas.[37] *See* Decision, dated Oct. 27, 2011, at 12; Decision, dated Nov. 29, 2011, at 14-15.  BROG makes no effort to demonstrate any error in the ONRR Director's rulings concerning the requirement to value the unprocessed gas at the higher of the gross proceeds received on the sale of the gas or 100% of the value of the residue gas attributable to processing, and we find none.[38]

In summary, we conclude that the Director of ONRR properly required BROG to compute and pay additional royalties for natural gas produced from Federal onshore oil and gas leases, during the periods from November 1, 1990, to August 31, 1996, from January 1, 1998, to December 31, 1999, and from January 1, 2000, to November 30, 2002.  We accordingly affirm his October and November 2011 decisions.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1, the decisions appealed from are affirmed.

James F. Roberts
Administrative Judge

I concur:

James K. Jackson
Administrative Judge

---

[37] The ONRR Director indicated that BROG had precluded ONRR from engaging in the appropriate comparison in the case of the unprocessed gas sold to CRI, since BROG had not supplied a copy of the arm's-length POP contract, under which the gas was sold to CRI.  Evidently, ONRR had undertaken that comparison in the case of the unprocessed gas sold to BPE.

[38] In its SOR (IBLA 2012-159), BROG states, at page 2 n.1, that it does not challenge the Director's November 29 ruling to require payment of the higher of the gross proceeds received under the POP contract and 100% of the value of the residue gas attributable to processing.  No similar language appears in connection with the appeal to the Board from the Director's October 27 ruling.  The ruling is simply not challenged.