UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BURLINGTON RESOURCES ) | |
| OIL & GAS COMPANY LP, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 13-CV-0678-CVE-TLW |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| THE INTERIOR, ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

This is an administrative appeal of a final agency action by the United States Department of the Interior.[1] See Dkt. # 2. Plaintiff Burlington Resources Oil & Gas Company LP (Burlington) has filed an opening brief (Dkt. # 31), defendant has filed a (corrected) response (Dkt. # 38-1), and Burlington has replied (Dkt. # 39). Burlington argues that defendant failed to correctly analyze when Burlington's produced gas became marketable, and requests that this matter be remanded to the agency. Dkt. # 31, at 6. Defendant argues that it has properly interpreted and applied the marketable condition rule. Dkt. # 38-1, at 6-8, 31.

### I.

Burlington "is a federal lessee and operator of multiple wells drilled upon federal leases in North Dakota." Dkt. # 2, at 2. Burlington "sold unprocessed gas at the wellhead pursuant to arm's-length percentage of proceeds [POP] contracts to Bear Paw Energy, Inc. (now ONEOK Rockies

---

[1] Additionally, before the Court is the Opposed Motion of Burlington Resources Oil & Gas Company LP for Oral Argument, With Brief in Support (Dkt. # 40). Defendant has not yet responded; however, there is no need for it to do so. The motion is denied, as the Court finds oral argument unnecessary.

Midstream, L.C.C. [collectively, ORM]), a 'midstream' purchaser, gatherer and processor of natural gas." Id. at 3; see also Dkt. # 20. ORM processed the gas, yielding residue gas and natural gas liquids (NGLs), and paid Burlington a percentage of the proceeds it received from selling the resultant residue gas and NGLs. Dkt. # 2, at 3; see also Dkt. # 20. Burlington "valued the residue gas and NGLs, for royalty purposes, using the actual proceeds payable to it by ORM, reporting certain expenses as part of transportation and processing allowances." Dkt. # 31, at 8; see also Dkt. # 19-1, at 5. Those expenses included treating and compression expenses that were later disallowed. Dkt. # 31, at 8; see also Dkt. # 19-1, at 5. Burlington has allegedly failed to pay royalties owed pursuant to its federal lease obligations. Dkt. # 2 at 1; see also Dkt. # 19-1, at 1-26.

Following audits by the State of North Dakota, defendant's Minerals Management Service (MMS)[2] entered two orders, styled MMS-08-0054-O&G and MMS-08-0055-O&G, determining that Burlington had "taken deductions from royalty that should be disallowed." Dkt. # 2, at 1, 6; see also Dkt. # 19-2, at 207-14; Dkt. # 19-5, at 81-88. The orders directed Burlington to pay additional royalties and to perform a restructured accounting. Dkt. # 19-2, at 207; Dkt. # 19-5, at 81. The orders stated that Burlington had sold gas to processors pursuant to POP contracts and had failed to place the gas in marketable condition at no cost to the government. Dkt. # 19-2, at 207, 209-210; Dkt. # 19-5, at 82-84. Burlington appealed each of those orders at the agency level. Dkt. # 2, at 1, 7; Dkt. # 19-2, at 204-05; Dkt. # 19-5, at 77-78.

---

[2]    MMS is the former agency name of the section of the Department of the Interior that managed receipts and disbursements from energy projects regulated by the Department of the Interior. Curry L. Hagerty, Cong. Research Serv., Department of the Interior (DOI) Reorganization of Ocean Energy Programs 3 (2012), available at http://www.fas.org/sgp/crs/misc/R42599.pdf.

The Office of Natural Resources Revenue (ONRR), MMS's successor for the collection and verification of natural resource revenues, granted in part and denied in part Burlington's appeals. Dkt. # 2 at 1; Dkt. # 19-2, at 133-53; Dkt. # 19-4, at 103-14; Dkt. # 19-5, at 1-13; Off. Nat. Resources Revenue, http://www.onrr.gov/ (last visited July 24, 2014). ONRR affirmed that Burlington had improperly deducted certain costs necessary to put the gas it sold to ORM into marketable condition; namely, dehydrating, compressing, and sweetening[3] the gas. Dkt. # 19-2, at 142; Dkt. # 19-4, at 113.[4] It also found that there was "no evidence of a competitive market, created by more than one purchaser, for uncompressed gas at the wellhead." Dkt. # 19-2, at 149; Dkt. # 19-5, at 8.

Burlington appealed ONRR's dispositions to the United States Department of the Interior Board of Land Appeals (IBLA).[5] Dkt. # 2, at 2; Dkt. 19-2, at 92; Dkt. # 19-3, at 68-79. Those disputes were redesignated and then consolidated under docket number IBLA 2012-96. Dkt. # 2, at 2; Dkt. # Dkt. # 19-1, at 58-62. The IBLA issued a consolidated decision on April 23, 2013. Dkt. # 2, at 2; Dkt. # 19-1, at 1-26. That decision affirmed ONRR's decisions in full. Dkt. # 2, at 2; Dkt. # 19-1, at 26. The IBLA concluded that ORM acted as an intermediary between Burlington and the

---

[3] "Sweetening" refers to the removal of hydrogen sulfide or carbon dioxide from a gas. Sweetening, The Oilfield Glossary, Schlumberger, http://www.glossary.oilfield.slb.com/en/Terms/s/sweetening.aspx (last visited July 24, 2014). ONRR did find that Burlington could properly deduct costs for sweetening, but only to the extent necessary to extract the sulfur sold as product. Dkt. # 19-2, at 142; Dkt. # 19-4, at 113.

[4] The portions of the orders that were reversed and the additional portions of the orders that were affirmed are not at issue in this case.

[5] The IBLA "is an appellate review body that exercises the delegated authority of the Secretary of the Interior to issue final decisions for the Department of the Interior." About the Interior Board of Land Appeals, U.S. Dep't Interior, http://www.doi.gov/oha/ibla/index.cfm (last visited July 24, 2014).

3

gas's ultimate third party purchaser and that compression, dehydration, and sweetening were necessary for the gas to be marketable to the ultimate third-party purchaser. Dkt. # 19-1, at 20. In reaching that conclusion, the IBLA noted that Burlington had failed to provide "any evidence that the unprocessed gas would be acceptable to a typical third-party purchaser at the well, before it has been compressed, dehydrated, sweetened, and then processed" or "any affirmative evidence in support of its assertion that the costs of compression, dehydration, and sweetening were not necessary to place the gas in marketable condition." Id. at 20-21. While acknowledging that dehydration, compression, and sweetening may have been necessary to process the gas, the IBLA determined that, since dehydration, compression, and sweetening were also necessary to render the gas marketable, Burlington was responsible for those costs. Id. at 22-23

Burlington filed this suit seeking review of the IBLA's final agency disposition, pursuant to 30 U.S.C. §1724(j) and the Administrative Procedures Act (APA), 5 U.S.C. § 703. Dkt. # 2, at 2. Burlington argues that the deductions it took were for the costs of processing and transporting the gas, not for the costs of putting it into marketable condition. Id. at 8. Burlington also argues that, contrary to MMS, ONRR, and IBLA's positions, Burlington's gas was, or, at the very least, may have been, marketable at the time it was sold to ORM. Id. at 11. The parties jointly filed the administrative record. Dkt. ## 19, 20.[6] Burlington has filed an opening brief (Dkt. # 31), defendant has filed a (corrected) response (Dkt. # 38-1), and Burlington has replied (Dkt. # 39).

---

[6] Before the administrative record was filed, Burlington moved to supplement the administrative record. Dkt. # 14. That motion was denied. Dkt. # 28.

**II.**

An agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. An action is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (describing the circumstances under which an agency rule would be arbitrary and capricious).

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985).

An agency's interpretation of its own regulations is entitled to substantial deference. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). Broad deference is especially warranted if "the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" Id. (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991)). However, if a regulation is unambiguous, no deference is accorded. Christensen v. Harris Cnty., 529 U.S. 576, 588 (2000).

**III.**

Under the Mineral Leasing Act (MLA), the Secretary of the Interior may lease federal lands for oil and gas exploration. 30 U.S.C. § 226. A federal lessee must pay a royalty of at least "12.5

5

percent in amount or value of the production removed or sold from the lease." Id. The Secretary of the Interior is authorized to prescribe rules and regulations governing leases. See id. § 189. Regulations prescribed by the Secretary of the Interior state that the value of gas that is ultimately processed but sold prior to being processed pursuant to a POP contract is "the gross proceeds accruing to the lessee." 30 C.F.R. § 1206.152(b)(1)(i).[7] Additionally, "[t]he lessee must place gas in marketable condition and market the gas for the mutual benefit of the lessee and the lessor at no cost to the Federal Government." Id. § 1206.152(i). If the gross proceeds received by the lessee have been reduced because the purchaser is performing services that would ordinarily be required of the lessee to place the gas in marketable condition, then the value of the gas will be increased to the extent that the gross proceeds have been reduced. Id.[8] "Marketable condition means lease

---

[7] At all times relevant to this action, this regulation was codified at 30 C.F.R. § 206.152. However, in 2010, the former 30 C.F.R. Part 206, which contained this and other production valuation regulations, was recodified to 30 C.F.R. Part 1206 without substantive change. Reorganization of Title 30, Code of Federal Regulations, 75 Fed. Reg. 61051, 61052 (Oct. 4, 2010). This opinion references the production valuation regulations by their new codifications.

[8] "To take a simple example, if it costs $20 to put gas in marketable condition by removing impurities, and the purified gas is sold for $100, 'gross proceeds' for purposes of royalty calculations is $100, regardless of whether the producer removes the impurities and sells the gas for $100, or instead sells the gas for $80 to a purchaser who then removes the impurities." Amoco Prod. Co. v. Watson, 410 F.3d 722, 726 (D.C. Cir. 2005), cert. granted as to a separate issue sub nom. BP Am. Prod. Co. v. Watson, 547 U.S. 1068 (2006), aff'd sub nom. BP Am. Prod. Co. v. Burton, 549 U.S. 84. The marketable condition rule thereby "anticipates and prohibits the type of arrangements . . . wherein producers offer reduced prices to purchasers who in turn incur the costs of placing gas in marketable condition." Amoco Prod. Co. v. Baca, 300 F. Supp. 2d 1, 12 (D.D.C. 2003), aff'd sub nom. Amoco Prod. Co. v. Watson, 410 F.3d 722 (D.C. Cir. 2005), cert. granted as to a separate issue sub nom. BP Am. Prod. Co. v. Watson, 547 U.S. 1068 (2006), aff'd sub nom. BP Am. Prod. Co. v. Burton, 549 U.S. 84.

products which are sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field or area." Id. § 1206.151.

There is "a meaningful distinction between marketing and merely selling gas." Amoco Prod. Co. v. Watson, 410 F.3d 722, 729 (D.C. Cir. 2005), cert. granted as to a separate issue sub nom. BP Am. Prod. Co. v. Watson, 547 U.S. 1068 (2006), aff'd sub nom. BP Am. Prod. Co. v. Burton, 549 U.S. 84.

> Theoretically, any gas— any 'production'— is 'marketable'. We can assume that, if the price were low enough to justify capital expenditures for conditioning equipment, someone would undertake to buy low pressure gas having a high water and hydrocarbon content. A lessee who sold unconditioned gas at such a price would, in a rhetorical sense, be fulfilling his obligation to 'market' the gas, and by thus saving on overhead he might find such business profitable. There is a clear difference between 'marketing' and merely selling. For the former there must be a market, an established demand for an identified product. We suppose almost anything can be sold, if the price is no consideration.

Cal. Co. v. Udall, 296 F.2d 384, 387-88 (D.C. Cir. 1961).

It is undisputed that Burlington "was not entitled to deduct from the royalty value of [its] gas, as determined by gross proceeds, any of the costs necessary to place the gas in a marketable condition." Dkt. # 19-1, at 6-7 (footnote omitted); Dkt. # 31, at 10 (quoting Dkt. # 19-1, at 6-7) (internal quotation marks omitted). Rather, the question in this case is whether the gas produced by Burlington was in marketable condition when it was sold to ORM.

**A. Defendant's Interpretation of the Marketable Condition Rule**

Defendant interprets the marketable condition rule as requiring that the produced gas be "acceptable to the ultimate third-party purchaser."[9] Dkt. # 19-1, at 20. Burlington argues that

---

[9] As the sales contract must be "typical for the field or area," the "dominant end-use" determines marketability requirements. See Amoco Prod. Co., 410 F.3d at 729.

defendant's interpretation of the marketable condition rule is contrary to the rule's clear language. Dkt. # 31, at 13-14. Burlington does not cite a single case rejecting defendant's interpretation of the marketable condition rule, relying instead on the language of the rule itself and the preamble to the regulation implementing the rule. See generally Dkt. ## 31, 39.

The marketable condition rule is ambiguous; there are multiple reasonable methods for determining the requirements of a "typical" sales contract. See Devon Energy Corp. v. Kempthorne, 551 F.3d 1030, 1037 (D.C. Cir. 2008). Therefore, defendant's interpretation of the rule is entitled to substantial deference. Thomas Jefferson Univ., 512 U.S. at 512. Additionally, the determination of the value of produced gas is part of a "complex and highly technical regulatory program," and, as such, deference to the defendant's interpretation is particularly appropriate. See Devon Energy Corp., 551 F.3d at 1037 (quoting Amoco Prod. Co., 410 F.3d at 729).

In effect, defendant's interpretation treats selling gas to a processing intermediary as a "mere sale" and not "marketing," unless the gas would be acceptable to the dominant end-users. Determining marketability based upon the dominant end-use of produced gas in the field or area "is entirely consistent with this regulatory scheme and the basic principle that the MLA contemplates a meaningful distinction between marketing and merely selling gas." Amoco Prod, Co., 410 F.3d at 729. This approach does not ignore gas that is sold to processing intermediaries; by definition, an intermediary will sell its output to another entity, and there is nothing to suggest that defendant is ignoring those sales when determining what sales contracts are typical for a field or area.

One Fifth Circuit case, Citation Oil & Gas Corp. v. U.S. Dep't of the Interior, 448 F. App'x 441 (5th Cir. 2011) (per curiam), dealt with a situation substantially similar to this case. There, as in this case, a lessee sold gas to a processor pursuant to a POP contract. See Citation, 448 F. App'x,

8

at 443. The Court held that the fact that the lessee had entered into POP contract with the processor suggested that the processor's compression and treatment expenses were necessary to place the gas into marketable condition. Id. at 446. Defendant's interpretation is consistent with this holding.

Burlington argues that such an interpretation is contrary to the preamble of the regulation implementing the marketable condition rule. Dkt. # 31, at 13-14. The preamble states:

> The MMS believes that the definition [of marketable condition] is clear, concise, and equitable. The definition is not subject to manipulation, as one commenter stated. Furthermore, the suggestion that a uniform standard be developed for what is "marketable" is unrealistic because the gas marketplace is dynamic. The definition, as written, allows MMS the latitude to apply the concept of "marketable" in a fair and correct manner, now and in future gas markets. Also, MMS adheres to its long standing policy that costs incurred to place production in a marketable condition are to be borne solely by the lessee.

Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed. Reg. 1230, 1243 (Jan. 15, 1988) (to be codified at 30 C.F.R. pt. 202 & 206). Burlington argues that looking to the dominant end-use ignores the "dynamic" qualities of different markets and results in a uniform standard. Dkt. # 31, at 14. This is not the case; a dominant end-use interpretation will result in differing standards as long as the dominant end-users in various fields and areas have differing standards for accepting gas.[10]

---

[10] Additionally, a later portion of the preamble makes it clear that "post-production costs" are generally disfavored. See Revision of Gas Royalty Valuation Regulations and Related Topics, 53 Fed. Reg. 1230, 1253 (Jan. 15, 1988) (to be codified at 30 C.F.R. pt. 202 & 206) ("Generally, [post-production costs] are not allowed as a deduction because they are necessary to make production marketable.").

Burlington attempts to distinguish Devon and Amoco on the ground that they dealt with coalbed methane,[11] and not conventional gas. Dkt. # 31, at 23-26. Burlington argues that coalbed methane is functionally different from the gas in this case because it is not typically processed, "as no heavier liquids are present to be extracted in any meaningful quantities." Id. at 23-24.[12] However, the lessees in Amoco sold their gas at the wellhead to purchasers who would treat the gas and then sell it to end-users. Amoco Prod. Co., 410 F.3d at 726. Burlington has failed to provide a compelling reason that defendant should be required to treat sales to ORM differently than the sales to treating purchasers in Amoco. Nor has Burlington convinced this Court that the general rules articulated in Devon cease to have persuasive value simply because NGLs could not be extracted from the gas in that case.[13] Burlington has offered distinctions, but no differences.

Burlington argues that the Fifth Circuit's Citation decision is flawed because it is based upon an "entirely false premise" and "embrace[s] [an] overt misunderstanding" of POP contracts. Dkt. # 31, at 26-27.[14] This Court is not so quick to impugn the reasoning of the Fifth Circuit. The Circuit

---

[11] "Coalbed methane" refers to natural gas that has been "generated during coal formation and adsorbed in coal." Coalbed Methane, The Oilfield Glossary, Schlumberger, http://www.glossary.oilfield.slb.com/en/Terms/c/coalbed_methane.aspx (last visited July 24, 2014). It is predominantly methane. Id.

[12] Presumably, Burlington's argument would extend to all dry gases.

[13] Burlington also argues that the rules articulated in Amoco and Devon are inapplicable because they deal with different basins than this case. Dkt. # 31, at 25-26. This argument is even less convincing; while the application of rules may differ based upon factors specific to individual basins, there is no reason to think that the rules themselves should differ simply because the basins do. In its reply brief, Burlington attempts to "walk back" both arguments, stating that it intended only to distinguish Amoco and Devon's factual determinations. Dkt. # 39, at 4. As Amoco and Devon are not being cited for their factual determinations or conclusions, but for their legal analysis, distinguishing them on this basis is of no avail.

[14] Burlington also implies that the Fifth Circuit is unfamiliar with the "oil and [sic] industry." Dkt. # 31, at 27 (presumably referring to the oil and gas industry).

appears to have adequately described the relationship between the lessee and processor. Citation Oil & Gas Corp., 448 F. App'x at 443. Additionally, that court's conclusion that the agreement suggested that the gas was not marketable prior to being processed is sound; the processor bought the gas not for its own use, but to sell to another party after placing it in a condition--through processing--that the other party would be willing to purchase. Id. at 446. Nor is the decision inconsistent with 30 C.F.R. § 1206.152(a)(1), as defendant alleges. See Dkt. # 31, at 28. Section 1206.152(a)(1) merely specifies that section 1206.152 applies to POP contracts. 30 C.F.R. § 1206.152(a)(1). A later subsection specifies that the "value of gas sold under an arm's-length contract is the gross proceeds accruing to the lessee."[15] Id. § 1206.152(b)(1)(i). A still-later subsection provides that the value must "be increased to the extent that the gross proceeds have been reduced because the purchaser, or any other person, is providing certain services the cost of which ordinarily is the responsibility of the lessee to place the gas in marketable condition or to market the gas." Id. § 1206.152(i). Defendant is correct that this regulation contemplates POP contracts as legitimate sales contracts; however, it does not follow that the regulation considers a POP contract to be evidence that the gas being sold is marketable.

Defendant's interpretation of the marketable condition rule is not plainly erroneous or inconsistent with the regulation. See Thomas Jefferson Univ,, 512 U.S. at 512. Therefore, this Court should, and will, defer to defendant's interpretation. See id. Whether gas is marketable depends on the requirements of the dominant end-users, and not those of intermediate processors.

---

[15] However in the case of a POP contract, "the value of production, for royalty purposes, shall never be less than a value equivalent to 100 percent of the value of the residue gas attributable to the processing of the lessee's gas." 30 C.F.R. § 1206.152(b)(1)(i).

**B. Marketability of the Gas Sold to ORM**

Burlington argues that defendant bears the burden of establishing when gas would be acceptable to a purchaser under a sales contract typical for the field or area. Dkt. # 31, at 18-21.[16] Defendant maintains that Burlington bears the burden of demonstrating that its gas would be marketable absent dehydration, compression, and sweetening. Dkt. # 37, at 23. Burlington bears the burden of establishing that its gas was marketable prior to processing. See Devon Energy Corp., 551 F.3d at 1037 (holding that the Department of the Interior's finding that the lessee's gas was unmarketable was not unreasonable despite the lessee's protests that there was no record support for the requirements of a typical sales contract); see also Amerada Hess Corp. v. Dep't of Interior, 170 F.3d 1032, 1037 (10th Cir. 1999) (stating that a lessee's reimbursements were subject to royalty payments because the lessee made no showing that its gas was in marketable condition); cf. BP Am. Prod. Co. v. Burton, 549 U.S. 84, 88 (2006) ("Lessees are responsible in the first instance for the accurate calculation and payment of royalties."). The administrative record is silent as to requirements of sales contracts typical for the field or area. See generally Dkt. ## 19-1, 19-2, 19-3, 19-4, 19-5, 19-6, 19-7.[17] Burlington has failed to meet its burden of establishing that its gas was marketable when it was sold to ORM. Consequently, the value of Burlington's gas should be

---

[16] Additionally, it notes that there are multiple potential markets for gas other than pipelines, possibly suggesting that something other than interstate pipelines could be the dominant end-use for gas in the field or area. See id. at 14-15. However, the administrative record does not support Burlington's bare assertions. See generally Dkt. ## 19-1, 19-2, 19-3, 19-4, 19-5, 19-6, 19-7. As discussed infra, Burlington bears the burden of establishing that its gas was marketable prior to processing.

[17] The contract between Burlington and ORM is part of the administrative record; however, as discussed supra, under defendant's interpretation of the marketable condition rule, that contract has no bearing on marketability.

increased for royalty purposes to the extent that the gross proceeds have been reduced because ORM is performing services that would ordinarily be required of Burlington to place the gas in marketable condition. See 30 C.F.R. § 1206.152(i).

**C. Services Necessary to Place Burlington's Gas in Marketable Condition**

Burlington has consistently maintained that ORM's cryogenic processing plant requires gas to be sweetened and dehydrated prior to processing. See e.g., Dkt. # 19-2, at 132. Burlington argues that defendant has failed to consider this alternative purpose for dehydration and sweetening, and that defendant is acting improperly by treating them as processes necessary to place the gas into marketable condition. Dkt. # 31, at 21-23.

Both orders underlying this action specifically address the necessity of compression and treatment to processing gas at a cryogenic plant. Dkt. # 19-2, at 209; Dkt. # 19-5, at 83-84. They state that "[s]ince the gas must be free of impurities and water in order to process it, sweetening (removal of sulphur) and dehydration (removal of water) are costs to place the gas in marketable condition." Dkt. # 19-2, at 209; Dkt. # 19-5, at 84. Likewise, they state that "[c]ompression required to raise the pressure high enough to enter the processing facility is a cost to place the gas in marketable condition." Dkt. # 19-2, at 210; Dkt. # 19-5, at 84. The IBLA also considered the necessity of compression and treatment to processing gas at a cryogenic plant. Dkt. # 19-1, at 22.

Interpreting the marketable condition rule as requiring a lessee to bear the costs of processes that make gas marketable, even if those processes serve additional functions, is not unreasonable. The marketable condition rule simply states that a producer "must" make its gas marketable at no cost to the government. 30 C.F.R. § 1206.152(i). Defendant's strict interpretation of this rule simply ensures that the government will not bear the cost of placing the gas in marketable condition.

13

This interpretation is analogous to the rule that, if a lessee processes its gas, it may not deduct costs associated with marketing even if they make processing more efficient. See Shoshone Indian Tribe, 903 F.2d 784, 788 (10th Cir. 1990); 30 C.F.R. § 1202.151(b); 30 C.F.R. § 1206.179(e). The Court cannot say that defendant's interpretation is plainly erroneous or inconsistent with the regulation. See Thomas Jefferson Univ., 512 U.S. at 512. As such, the Court will defer to defendant. See id. The costs of sweetening, dehydrating, and compressing the produced gas are royalty bearing.

Each of Burlington's arguments has been found to be without merit. Therefore, the IBLA's decision should be affirmed.

**IT IS THEREFORE ORDERED** that the decision of the United States Department of the Interior Board of Land Appeals is **affirmed**. A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that the Opposed Motion of Burlington Resources Oil & Gas Company LP for Oral Argument, With Brief in Support (Dkt. # 40) is **denied**.

**DATED** this 24th day of July, 2014.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE